UNITED STATES COURT OF INTERNATIONAL TRADE

JELD-WEN, INC.,

                         Plaintiff,

         v.

UNITED STATES,

                         Defendant,

         and

COALITION     OF     AMERICAN     MILLWORK
PRODUCERS,

                         Defendant-Intervenor.

Before: Leo M. Gordon, Judge

Court No. 21-00114

**PLAINTIFF'S RULE 56.2 MOTION FOR**
**JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff JELD-WEN, Inc. hereby moves for judgment on the agency record with regard to the final determination issued by the U.S. International Trade Commission ("Commission" or "ITC") in the Antidumping ("AD") and Countervailing Duty ("CVD") investigations of Wood Mouldings and Millwork Products ("WMMP") from China. *See Wood Mouldings and Millwork Products from China*, 86 Fed. Reg. 9951 (Int'l Trade Comm. Feb. 17, 2021) (hereinafter "Final ITC Determination").

Plaintiff requests that this Court rule that the Commission's:

  1.  like product determination;

  2.  domestic industry determination;

  3.  determination to proceed under a material injury/threat of material injury standard rather than a material retardation standard; and

4.  determination that the domestic WMMP industry was materially injured "by reason of" the subject imports;

were each unsupported by substantial evidence or otherwise not in accordance with law.

Plaintiff further requests that this Court remand this matter to the ITC with instructions to undertake further proceedings consistent with the accompanying Memorandum of Law and proposed Order.

The reasons justifying Plaintiff's Motion are set forth in the accompanying Brief in Support of Rule 56.2 Motion for Judgment on the Agency Record.

Respectfully submitted,

James L. Rogers, Jr.
James L. Rogers, Jr.
Nelson Mullins Riley & Scarborough LLP
2 W. Washington Street, Suite 400
Greenville, SC 29601
(864) 373-2300

*Counsel for JELD-WEN, Inc.*

August 17, 2021

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JELD-WEN, INC.,<br><br>                    Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>                    Defendant,<br><br>    and<br><br>COALITION OF AMERICAN MILLWORK PRODUCERS,<br><br>                    Defendant-Intervenor. | Before: Leo M. Gordon, Judge<br><br>Court No. 21-00114<br><br>**PUBLIC VERSION**<br><br>*BPI deleted from brackets on pages 17-18* |

**PLAINTIFF'S BRIEF IN SUPPORT OF
RULE 56.2 MOTION FOR JUDGMENT
ON THE AGENCY RECORD**

Dated: August 17, 2021

James L. Rogers, Jr.

**Nelson Mullins Riley & Scarborough LLP**
2 W. Washington Street, Suite 400
Greenville, SC 29601
(864) 373-2300

*Counsel for JELD-WEN, Inc.*

## TABLE OF CONTENTS

**STATEMENT PURSUANT TO RULE 56.2(c)(1)**...................................................................1

    I.     ADMINISTRATIVE DETERMINATION TO BE REVIEWED ............................... 1

    II.    ISSUES OF LAW PRESENTED ............................................................... 1

**STANDARD OF REVIEW** ................................................................................ 2

    I.     SUBSTANTIAL EVIDENCE STANDARD ................................................... 2

    II.    NOT IN ACCORDANCE WITH LAW STANDARD ................................. 3

**ARGUMENT**........................................................................................................ 5

    I.     The Commission's determination that Laminated Veneer Lumber (LVL) and traditional, solid wood mouldings and millwork products ("Traditional WMMP") constitute a single like product, while MDF and Traditional WMMP are not like products, was unsupported by substantial evidence and otherwise not in accordance with the law ...........................................................................................5

        A.  The Commission's determination that Laminated Veneer Lumber (LVL) and traditional, solid wood mouldings and millwork products ("Traditional WMMP") constitute a single like product, while MDF and Traditional WMMP are not like products, was unsupported by substantial evidence ................... 10

            i.    Physical Characteristics and Uses ................................................11

                a.  Physical Characteristics....................................................11

                b.  Product Uses........................................................................12

            ii.   Manufacturing Facilities, Production Processes, and Production Employees.............................................................................................13

            iii.  Interchangeability ....................................................................15

            iv.  Customer Perceptions and Price ....................................................17

            v.   Channels of Distribution ..............................................................19

            vi.  Conclusion ...................................................................................19

        B.  The Commission's determination that Laminated Veneer Lumber (LVL) and traditional, solid wood mouldings and millwork products ("Traditional WMMP") constitute a single like product, while MDF and Traditional WMMP are not like products, was not in accordance with the law................................... 20

    II.    The Commission's determination that there is a single "Domestic Industry," encompassing producers of both LVL and Traditional WMMP, was unsupported by substantial evidence and otherwise not in accordance with the law.........................…21

    III.   The Commission's failure to conduct a material retardation analysis as it pertains to LVL, rather than a material injury/threat of injury analysis was not supported by substantial evidence and was not in accordance with the law .................................... 23

IV.   The Commission's finding that the alleged material injury to the domestic WMMP industry was "by reason of" (caused by) the subject imports was unsupported by substantial evidence ................................................................................................26

**CONCLUSION** ................................................................................................**30**

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
  515 F.3d 1372 (Fed. Cir. 2008) ................................................................................ 6

*Altx, Inc. v. United States,*
  370 F.3d 1108, 1120 (Fed. Cir. 2004) ..................................................................... 27

*Autoliv Asp, Inc. v. United States,*
  422 F. Supp. 3d 1295 (Ct. Int'l Trade 2019). ............................................................ 2

*Bd. of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 106 S.Ct. 681,
  88 L.Ed.2d 691 (1986) .............................................................................................. 4

*Burlington Truck Lines, Inc. v. United States,*
  371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) ............................................... 3, 5

*Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n,*
  100 F. Supp. 3d 1314 (Ct. Int'l Trade 2015) ............................................................. 6

*Changzhou Trina Solar Energy Co. v. United States Int'l Trade Comm'n,*
  879 F.3d 1377, 1380 (Fed. Cir. 2018) ..................................................................... 26

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*
  467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ....................... 3, 4, 5, 20, 21, 23

*Cleo Inc. v. United States,*
  501 F.3d 1291 (Fed. Cir. 2007) ............................................................................. 6, 7

*Comm. of Domestic Steel Wire Rope & Specialty Cable Mfrs. v. United States*, 818 F. Supp. 376,
  380 (Ct. Int'l Trade 1993) ...................................................................................... 26

*Consol. Edison Co. v. NLRB,*
  305 U.S. 197 (1938). ................................................................................................. 2

*CS Wind Vietnam Co. v. United States,*
  832 F.3d 1367 (Fed. Cir. 2016) ................................................................................. 3

*Dongbu Steel Co. v. United States,*
  635 F.3d 1363, 1371 (Fed. Cir. 2011) ..................................................................... 20

*Former Emples. Of IBM v. United States Secy. Of Labor,*
  29 CIT 1360 (2005) ................................................................................................... 3

*Gerald Metals, Inc. v. United States,*
  132 F.3d 716 (Fed. Cir. 1997) ................................................................................... 3

*Gifford-Hill Cement Co. v. United States,*
  615 F. Supp. 577 (Ct. Int'l Trade 1985) ................................................................. 26

*Hosiden Corp. v. Advanced Display Mfrs. of Am.,*
  85 F.3d 1561, 1567 (Fed. Cir. 1996) ......................................................................... 7

*Int'l Imaging Materials, Inc. v. U.S. Int'l Trade Comm'n,*
  30 CIT 1181, 1183, 2006 WL 270156 (2006) ........................................................... 7

*Kisor v. Wilkie,*
  139 S. Ct. 2400, 2414, 204 L. Ed. 2d 841 (2019) ..................................................... 5

*Mitsubishi Heavy Indus. v. United States,*
  22 CIT 541, 15 F.Supp.2d 807 (1998) ...................................................................... 4

*Mittal Steel Point Lisas Ltd. v. United States,*

542 F.3d 867, (Fed. Cir. 2008)..................................................................... 27

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.*,
   463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ............................... 5

*NEC Corp. v. Dep't of Commerce*,
   22 CIT 1108, 1110 (1998) ........................................................................ 7

*Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*,
   260 F.3d 1365, 1379–80 (Fed.Cir.2001)................................................... 20

*Negev Phosphates, Ltd. v. United States*,
   12 CIT 1074, 699 F.Supp. 938 (1988) ..................................................... 4

*New York v. United States*,
   342 U.S. 882, 884, 72 S.Ct. 152, 153, 96 L.Ed. 663 (1951) .................... 5

*Nippon Steel Corp. v. U.S. Intern. Trade Comm'n*,
   239 F. Supp. 2d 1367, (Ct. Int'l Trade 2002) ...................................... 2, 3

*Nippon Steel Corp. v. United States*,
   19 CIT 450, 455 (1995) ............................................................................ 7

*NMB Singapore Ltd. v. United States*,
   27 C.I.T. 1325 (2003) ...................................................................... 4, 21, 23

*Nucor Corp. v. United States*,
   33 CIT 157 (2009) .................................................................................... 3

*Roquette Freres v. United States*,
   583 F. Supp. 599, 604 (Ct. Int'l Trade 1984) ................................... 21, 24

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
   44 F.3d 978 (Fed. Cir. 1994).................................................................... 3

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951)............................................................................. 2, 3

## Statutes

19 U.S.C. § 1516a(b)(1)(B) ...................................................................... 2
19 U.S.C. § 1516a(b)(l)(B)(i) ................................................................... 2
19 U.S.C. § 1671 ......................................................................... 6, 7, 21
19 U.S.C. § 1673 ......................................................................... 6, 7, 21
19 U.S.C. § 1671b ..................................................................................... 22
19 U.S.C. § 1673b ..................................................................................... 22
19 U.S.C. § 1677(10) ........................................................................ 6, 19, 20
19 U.S.C. § 1677(4) ......................................................................... 19, 20, 21
19 U.S.C. § 1677(7)(C)(i)–(iv) .............................................................. 27

## Administrative Decisions

*Certain Commuter Airplanes from France & Italy*, 4 ITRD 1366 (1982) ............................ 23, 24

*Crystalline Silica Photovoltaic Cells and Modules from China*, Inv. Nos. 701-TA-481 and 731-
   TA-1190 (Final), USITC Pub. 4360 at 12-13 (Nov. 2012) ................................ 22

*Fresh and Chilled Atlantic Salmon from Norway*, Inv. No. 701-TA-302 (Preliminary) and Inv.
   No. 731-TA-454 (Preliminary), USITC Pub. 2272 (April 1990) ........................... 23

*Laminated Woven Sacks from China*, USITC Inv. No. 701-TA-450 (July 2008)................. 22, 24

*Wood Mouldings and Millwork Products From Brazil and China,* 85 Fed. Reg. 2438 (Int'l Trade Comm., Jan. 15, 2020) (Institution of Anti-Dumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations) ............................................................ 8

*Wood Mouldings and Millwork Products From Brazil and China*, 85 Fed. Reg. 11391 (Int'l. Trade Comm'n Feb. 27, 2020)................................................................................................ 8

*Wood Mouldings and Millwork Products From Brazil and the People 's Republic of China*, 85 Fed. Reg. 6502 (Dep't Commerce Feb. 5, 2020) (Initiation of Less-Than-Fair-Value Investigations)............................................................................................................................ 8

*Wood Mouldings and Millwork Products From Brazil and the People 's Republic of China*, 85 Fed. Reg. 6513 (Dep't Commerce Feb. 5, 2020) (Initiation of Countervailing Duty Investigation) .......................................................................................................................... 8

*Wood Mouldings and Millwork Products from China*, 86 Fed. Reg. 9951 (Int'l Trade Comm. Feb. 17, 2021) (hereinafter "Final ITC Determination")...................................................... 10

## **Other**

3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2019) ....................... 2

H.R. Rep. 96-317  (1979)............................................................................................................. 27

Herbert C. Shelley, et al., *Area Summaries: The Standard of Review Applied by the United States Court of Appeals for the Federal Circuit in International Trade and Customs Cases*, 45 AM. U.L. REV. 1749, 1773 (1996)................................................................................................ 2

S. REP. 96-249, 75, 1979 U.S.C.C.A.N. 381 (1979)................................................................. 27

Uruguay Round Agreements Act, Statement of Administrative Action ("SAA") (1994) ...........27

## STATEMENT PURSUANT TO RULE 56.2(c)(1)

### I.    ADMINISTRATIVE DETERMINATION TO BE REVIEWED

Plaintiff Jeld-Wen, Inc. ("Jeld-Wen" or "Plaintiff"), submits this Rule 56.2 Opening Brief in support of its Motion for Judgment on the Agency Record. Jeld-Wen seeks review of the final affirmative determination in the Antidumping ("AD") and Countervailing Duty ("CVD") investigations of the International Trade Commission ("Commission" or "ITC") on Wood Mouldings and Millwork Products ("WMMP") from China. *See Wood Mouldings and Millwork Products from China*, 86 Fed. Reg. 9951 (Int'l Trade Comm. Feb. 17, 2021) (hereinafter "Final ITC Determination") and accompanying Final Views of the Commission, PD 232 at 733626 (Feb. 10, 2021) (hereinafter "Final Views").

Specifically, Jeld-Wen requests that this Court rule that the Commission's like product determination, domestic industry determination, material injury determination, and determination to proceed under a material injury or threat of material injury inquiry rather than a material retardation inquiry were unsupported by substantial evidence or otherwise not in accordance with law and must therefore be remanded to the Commission with instructions to undertake further proceedings consistent with the accompanying Memorandum of Law and proposed order.

### II.   ISSUES OF LAW PRESENTED

1. The Commission's determination that Laminated Veneer Lumber (LVL) and traditional, solid wood mouldings and millwork products ("Traditional WMMP") constitute a single like product, while MDF and Traditional WMMP are not like products, was unsupported by substantial evidence and otherwise not in accordance with the law.

2. The Commission's determination that there is a single "Domestic Industry," encompassing producers of both LVL and Traditional WMMP, was unsupported by substantial evidence and otherwise not in accordance with the law.

3. The Commission's failure to conduct a material retardation analysis as it pertains to LVL, rather than a material injury/threat of injury analysis, was not in accordance with the law.

4. The Commission's finding that the alleged material injury to the domestic WMMP industry was "by reason of" (caused by) the subject imports was unsupported by substantial evidence.

## STANDARD OF REVIEW

The Court of International Trade reviews final determinations of the Commission under the standards of the Tariff Act of 1930, as amended (the "Act"). See 19 U.S.C. § 1516a(b)(1)(B). The court must hold unlawful any determination, finding, or conclusion found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(l)(B)(i); *Nippon Steel Corp. v. U.S. Intern. Trade Comm'n*, 239 F. Supp. 2d 1367, 1369 (Ct. Int'l Trade 2002).

## I.     Substantial Evidence Standard

"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citations omitted). "Fundamentally, though, 'substantial evidence' is best understood as a word formula connoting a reasonableness review." *Autoliv Asp, Inc. v. United States*, 422 F. Supp. 3d 1295, 1302 (Ct. Int'l Trade 2019) (citing 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24 (3d ed. 2019). The emphasis under the substantial evidence standard is therefore be on the agency's reasoning process, rather than the quantity of evidence *See* Herbert C. Shelley, et al., *Area Summaries: The Standard of Review Applied by the United States Court of Appeals for the Federal Circuit in International Trade and Customs Cases*, 45 AM. U.L. REV. 1749, 1773 (1996) (analyzing the same standard of review applied by the Court of International Trade here).

**PUBLIC VERSION**

"Moreover, the evidence on which the agency relies does not exist in a vacuum." *Former Emples. Of IBM v. United States Secy. Of Labor*, 29 CIT 1360, 1374 (2005). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997)) (internal citations omitted); *see also Nucor Corp. v. United States*, 33 CIT 157, 182 (2009) (noting that the Commission "must address significant arguments and evidence which seriously undermine its reasoning and conclusions). This includes "contradictory evidence or evidence from which conflicting inferences could be drawn." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)) (explaining that the substantial evidence standard requires that contradictory record evidence be taken into account)) (internal citations omitted).

Where an adequate basis in support of the Commission's choice of evidentiary weight is lacking, the Court is not required to defer to the Commission, and remand may be appropriate. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1359 (Fed. Cir. 2006) ("So long as there is adequate basis in support of the Commission's choice of evidentiary weight, the Court of International Trade, and this court, reviewing under the substantial evidence standard, must defer to the Commission."); *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) (finding that remand is appropriate where an agency has not articulated a "rational connection between the facts found and the choices made").

II.    **Not in Accordance with Law Standard**

To determine whether the Commission's interpretation and application of a statute is "in accordance with law," the Court must undertake the two-step analysis prescribed by *Chevron*

**PUBLIC VERSION**

*U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *NMB Singapore Ltd. v. United States*, 27 C.I.T. 1325, 1331 (2003). Under *Chevron*, the court first considers "whether Congress has directly spoken to the precise question at issue"—that is, whether Congressional intent on the issue is clear. *Chevron*, 467 U.S. at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-3. However, if Congress has not directly addressed the precise question at issue such that the statute is silent or ambiguous with respect to the specific issue, the question for the court then becomes whether the agency's construction of the statue is permissible. *Id.* at 843.

This is an inquiry into the reasonableness of the Commission's interpretation. *NMB Singapore Ltd.*, 27 C.I.T. at 1331. The "{C}ourt will sustain the determination if it is reasonable and supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence." *Negev Phosphates, Ltd. v. United States*, 12 CIT 1074, 1077, 699 F.Supp. 938, 942 (1988) (citations omitted). In determining whether the Commission's interpretation is reasonable, the Court considers the following non-exclusive list of factors: the express terms of the provisions at issue, the objectives of those provisions, and the objectives of the antidumping scheme as a whole. *See Mitsubishi Heavy Indus. v. United States*, 22 CIT 541, 545, 15 F.Supp.2d 807, 813 (1998).

Although the court may not substitute its judgment for the agency's judgment when the choice is between two fairly conflicting views, the court's deference cannot allow the agency to deviate from the clearly expressed intent of Congress. *Bd. of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 368, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986). As the Supreme Court has emphasized, "{e}xpert discretion is the lifeblood of the administrative process,

4

but 'unless we make the requirements for administrative action strict and demanding, expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion.'" *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 48, 103 S.Ct. 2856, 2869, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962) and *New York v. United States*, 342 U.S. 882, 884, 72 S.Ct. 152, 153, 96 L.Ed. 663 (1951) (Douglas J., dissenting)).

Moreover, the Supreme Court has recently emphasized that even where a statute is found to be ambiguous, not all agency constructions of such statutes—*even those which are found to be reasonable*—are entitled to deference. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2414, 204 L. Ed. 2d 841 (2019) (adopting the same approach as *Chevron* for ambiguous regulations) (emphasis added). Instead, to determine whether agency deference is appropriate, a court "a court must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Id*. at 2416. Although courts "presume that Congress intended for courts to defer to agencies when they interpret their own ambiguous rules," courts should *not* give deference to an agency's reading when the reasons for that presumption do not apply, or countervailing reasons outweigh them. *Id*. The Commission's interpretation must therefore be set aside not only if it is "arbitrary, capricious, or manifestly contrary to the statute," *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778, but also if countervailing reasons show that the agency should not be afforded ordinary deference.

## **ARGUMENT**

I.     **The Commission's determination that Laminated Veneer Lumber (LVL) and traditional, solid wood mouldings and millwork products ("Traditional WMMP") constitute a single like product, while MDF and Traditional WMMP are not like products, was unsupported by substantial evidence and otherwise not in accordance with the law.**

Commerce ("Commerce") and the Commission have distinct functions in antidumping and countervailing duty proceedings. *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 515 F.3d 1372, 1375 (Fed. Cir. 2008). Commerce determines the "scope" of the investigation by determining the "class or kind of foreign merchandise {that} is being, or is likely to be, sold in the United States at less than its fair value" or has been subsidized. *Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n*, 100 F. Supp. 3d 1314, 1319 (Ct. Int'l Trade 2015), *aff'd sub nom. Changzhou Trina Solar Energy Co. v. United States Int'l Trade Comm'n*, 879 F.3d 1377 (Fed. Cir. 2018); *see also* 19 U.S.C. §§ 1671, 1673.

The Commission, on the other hand, is responsible for determining whether imported articles within that scope (the "subject merchandise") have injured a domestic industry. *See* 19 U.S.C. §§ 1671, 1673. To make this determination, the Commission must make a "like product" determination wherein the Commission identifies "the corresponding universe of items produced in the United States that are like{,} or in the absence of like, most similar in characteristics and uses with the items in the scope of the investigation." *Int'l Imaging Materials, Inc. v. U.S. Int'l Trade Comm'n*, 30 CIT 1181, 1183, 2006 WL 270156 (2006); *see also* 19 U.S .C. § 1677(10) (defining "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle"). Once the Commission has identified the "like product", it then compares the subject merchandise—i.e. the "in-scope" products identified by Commerce—to their U.S. domestic counterpart, or "domestic like product."

Therefore, the "scope" and the "like product" are entirely different categories determined by entirely different agencies for entirely different purposes. Indeed, although the scope of an

**PUBLIC VERSION**

investigation "is necessarily the starting point of the Commission's like product analysis," *Cleo*

*Inc. v. United States*, 501 F.3d 1291, 1298 n.1 (Fed. Cir. 2007) (citing 19 U.S.C. § 1677(10)), the

scope "does not control the Commission's determination," with regard to the like product. *Id.; see*

*also Hosiden Corp. v. Advanced Display Mfrs. of Am.*, 85 F.3d 1561, 1567 (Fed. Cir. 1996)

("Commerce's designation of the class or kind of merchandise sold at LTFV does not control the

Commission's definition of the industry injured in its sales of like products."); *NEC Corp. v. Dep't*

*of Commerce*, 22 CIT 1108, 1110 (1998) ("Although the Commission must accept the

determination of Commerce as to the scope of the imported merchandise sold at less than fair

value, the Commission determines what domestic product is like the imported articles Commerce

has identified.")

In defining the domestic like product, the Commission typically considers the following

six factors: (1) physical characteristics and uses; (2) common manufacturing facilities and

production employees; (3) interchangeability; (4) customer perceptions; (5) channels of

distribution; and (6) price. *Cleo Inc.*, 501 F.3d at 1295. Where the subject merchandise involves a

range of products, as is the case here, the Commission disregards minor variations absent a "clear

dividing line" between particular products in the group. *See, e.g., Nippon Steel Corp. v. United*

*States*, 19 CIT 450, 455 (1995).

In this case, the Defendant-Intervenor (the Coalition of American Millwork Producers or

"Coalition"),[1] filed petitions with the U.S. Department of Commerce ("Commerce") and the

Commission On January 8, 2020, alleging that the domestic millwork products industry in the

---

[1] The Coalition of American Millwork Producers initially consisted of Bright Wood Corporation, Cascade Wood Products, Inc., Endura Products, Inc., Sierra Pacific Industries, Sunset Moulding, Woodgrain Millwork Inc., and Yuba River Moulding. During the final phase of the investigations, Best Moulding Corporation, Menzner Lumber and Supply Company, and Pacific Wood Laminates joined the Coalition.

**PUBLIC VERSION**

United States was being materially injured or threatened with material injury by reason of Wood

Mouldings and Millwork Products (WMMP) imported from Brazil and the People's Republic of

China ("China"). Petition, PD 1 at 698656 (Jan. 8, 2020). Commerce and the Commission

thereafter initiated antidumping and countervailing duty investigations of imports of WMMP from

China and Brazil. *See Wood Mouldings and Millwork Products From Brazil and China,* 85 Fed.

Reg. 2438 (Int'l Trade Comm., Jan. 15, 2020) (Institution of Anti-Dumping and Countervailing

Duty Investigations and Scheduling of Preliminary Phase Investigations); *Wood Mouldings and*

*Millwork Products From Brazil and the People 's Republic of China*, 85 Fed. Reg. 6502 (Dep't

Commerce Feb. 5, 2020) (Initiation of Less-Than-Fair-Value Investigations); *Wood Mouldings*

*and Millwork Products From Brazil and the People 's Republic of China*, 85 Fed. Reg. 6513 (Dep't

Commerce Feb. 5, 2020) (Initiation of Countervailing Duty Investigation).

      Commerce subsequently defined the "scope" of the subject merchandise to include "wood

mouldings and millwork products that are made of wood (regardless of wood species), bamboo,

laminated veneer lumber (LVL), or of wood and composite materials (where the composite

materials make up less than 50 percent of the total merchandise), and which are continuously

shaped wood or finger-jointed or edge-glued moulding or millwork blanks (whether or not

resawn)." *See* Commerce's Notification Letter, Final Results, and Decision Memoranda, PD 204

at document 729207 (Dec. 30, 2020). Medium Density Fiberboard ("MDF") was not included in

the scope determined by Commerce. *Id*.

      On February 24, 2020, the Commission issued its preliminary determination that there was

a reasonable indication that an industry in the United States was being materially injured by reason

of imports of WMMP from China that were being sold in the United States at LTFV and that such

imports were being subsidized by the government of China. *See Wood Mouldings and Millwork*

*Products From Brazil and China*, 85 Fed. Reg. 11391 (Int'l. Trade Comm'n Feb. 27, 2020)

("Preliminary ITC Determination") and accompanying Preliminary Consolidated Reports And

Views, PD 107 at 703828 (Mar. 2, 2020). The Commission also preliminarily declined to

recognize LVL as a separate like product. *See id.* Instead, the Commission defined a single

domestic like product that included LVL and more traditional WMMP, but oddly excluded

Medium Density Fiberboard ("MDF"), an engineered wood product like LVL, despite both LVL

and MDF being readily distinguishable from more traditional WMMP.  *See id.*

    Several parties, including Plaintiff, immediately raised various objections to the proper

definition of the domestic "like product" in this case, including, *inter alia*, arguments that LVL is

a separate like product from Traditional WMMP. In its preliminary determination, the Commission

acknowledged that the record indicates that there are some differences between LVL and WMMP,

but, in light of the limited nature of the record of the preliminary phase of the investigations, the

Commission stated it would further examine the domestic like product issues regarding LVL in

the final phase of the investigation. *See id.*

    On December 15, 2020, Plaintiff submitted its prehearing brief urging the Commission to

find that LVL is a separate like product from Traditional WMMP based on the Commission's

traditional six-fact like product analysis. *See* Pre-Hearing Brief of JELD-WEN, Inc., CD 521 at

728104 (Dec. 15, 2020). Prior to making its final material injury determination, the Commission

held a public hearing on December 22, 2020 (the "Final Hearing"). As explained in greater detail

in the following sections, testimony from the Final Hearing and evidence gathered prior to that

hearing via questionnaires showed that LVL is qualitatively different from traditional, solid

wood, finger-jointed wood moulding and millwork products ("Traditional WMMP"); that there

are acute differences in the manufacturing processes, equipment, and personnel used in

manufacturing LVL versus Traditional WMMP; and that only one Petitioner even makes LVL. Thus, there is no domestic LVL industry remotely capable of meeting the needs of U.S. purchasers. Further, none of the Respondents who testified at the Final Hearing spoke of having made any concrete plans to invest in LVL production. In fact, the evidence showed that in the event that punitive tariffs are placed on LVL imports, U.S. purchasers will nevertheless be forced to continue to import LVL from Asia, the only region where LVL is produced at scale.

On February 10, 2021, the Commission issued its Final Determination that an industry in the United States is materially injured by reason of imports of WMMP from China. *See Wood Mouldings and Millwork Products from China*, 86 Fed. Reg. 9951 (Int'l Trade Comm. Feb. 17, 2021) (hereinafter "Final ITC Determination") and accompanying Final Views of the Commission, PD 232 at 733626 (Feb. 10, 2021) (hereinafter "Final Views"). The Commission's Final Determination again declined to recognize LVL as a separate like product. *See* Final Views at 10-17. However, the reasons that the Commission relied upon to determine that MDF was not included within the Commission's definition of the domestic like product were equally applicable to LVL. In fact, the evidence showed that LVL and MDF have more in common than either product has in common with Traditional WMMP.

**A. The Commission's determination that Laminated Veneer Lumber (LVL) and traditional, solid wood mouldings and millwork products ("Traditional WMMP") constitute a single like product, while MDF and Traditional WMMP are not like products, was unsupported by substantial evidence.**

Although the Commission recognized that there are similarities and differences between LVL and Traditional WMMP and between MDF and Traditional WMMP, the Commission ultimately held that LVL was not a separate like product because its similarities to Traditional WMMP were too strong. *See id.* at 17. In the Commission's like product analysis of MDF,

however, it found that MDF was different from WMMP for many of the same reasons that it chose to ignore or find negligible when comparing LVL to Traditional WMMP. *See id.* at 17-24. The inconsistencies in the Commission's determinations and reasoning are provided in sections (A)-(D) below (based upon the traditional six-factor test addressed above), and demonstrate that the Commission's like product determination was unsupported by substantial evidence.

        **i.**    **Physical Characteristics and Uses**

        **a.**  **Physical Characteristics**

The Commission found that Traditional WMMP is typically made from solid or finger-jointed lumber, while LVL and MDF are both made from wood derived raw materials that are engineered with glue or resin under heat and pressure to form a finished product. Final Views, 12-13, 18. More specifically, the Commission described LVL as an engineered wood product made from wood fiber glued together and cured using heat and pressure, and MDF as sawdust and shavings mixed with resin and formed into MDF panels under heat and pressure. *Id.* Respondents attempted to distinguish between MDF and LVL by arguing that LVL is made of wood but MDF is not; however, as Commissioner Johanson pointed out at the Final Hearing, "are sawdust and shavings not wood, at least in the sense that wood veneer is shaved wood?" Final Hearing Transcript, PD 203 at 120:14-16 (Dec. 23, 2020). Despite the fact that LVL and MDF are both products engineered using wood derived raw materials, fiber, heat, and pressure, the Commission found that MDF was *not* similar to WMMP with regard to physical characteristics, while LVL was so similar that it constituted a single like product with Traditional WMMP. *See* Final Views, 22-24.

Ct. No. 21-00114                                        **PUBLIC VERSION**

.

### b. Product Uses

The Commission then drew a distinction between MDF and Traditional WMMP based on the way that the engineered nature of MDF imparts performance characteristics to MDF that are not present in Traditional WMMP. In particular, the Commission found that MDF is weaker, does not hold a screw as well, and is less resistant to moisture than Traditional WMMP. *See* Final Views, 18. However, the Commission drew *even more distinctions* with regard to performance characteristics and product uses between LVL and Traditional WMMP than it did between MDF and Traditional WMMP.

For example, the Commission found that the engineered nature of LVL imparts superior performance characteristics to LVL that are not present in Traditional WMMP, such as greater strength, stability, and resistance to damage. Final Views, 15. The Commission noted that those LVL properties make it easier to manufacture LVL (in contrast to Traditional WMMP) to comply with certain high-performance industry standards and state/local building regulations, such as those for door frames subjected to extreme weather conditions. *Id.* The Commission acknowledged that manufacturers using LVL could make better quality door frames while generating lower scrap rates. *Id.* To the extent that the Commission determined that MDF was not included in the Commission's definition of like product despite its general flimsiness (as compared to Traditional WMMP), then it should have found that LVL was a separate like product, given its many enhanced performance characteristics, including greater strength. In fact, MDF and WMMP have much more in common with regard to physical characteristics and uses than LVL—both are weaker than LVL, both have issues being used in areas exposed to high moisture, and both fare poorly in certain structural applications, such as door frames.

12

Ct. No. 21-00114                                          **PUBLIC VERSION**

### ii.     Manufacturing Facilities, Production Processes, and Production Employees

The Commission acknowledged that LVL and MDF are made in separate manufacturing facilities using different employees than Traditional WMMP. Final Views 13, 19. The Commission also acknowledged that the front-end processes for the production of LVL and MDF both differ from Traditional WMMP and that the back-end process for LVL, MDF, and Traditional WMMP are all similar. Final Views 13-14, 19-20. Despite the foregoing, the Commission attempted to draw a distinction between MDF and Traditional WMMP by asserting that MDF production requires different, complex, and capital-intensive facilities while ignoring the fact that *the same is true as to LVL.*

For example, Mark Dixon of JELD-WEN testified at the Final Hearing that in order to start producing LVL in useful commercial quantities, the domestic industry would need to make a sizable, upfront investment—an investment that the Traditional WMMP industry in the U.S. has refused to make. For example, although Mr. Jon Gartman of Sierra Pacific testified that his company has invested "tens of millions of dollars" in new equipment in recent years, he did not indicate that any of that investment had been in LVL production capacity. Final Hearing Transcript, PD 203 at 57:5-12. (Dec. 23, 2020). Further, none of the Respondents' representatives at the Final Hearing, including representatives for Woodgrain Millwork, Endura Products or Sierra Pacific, companies which have been in business for decades, testified that they were making any concrete future plans to invest in LVL production. A representative for Woodgrain actually indicated that Woodgrain had intentionally backed off their efforts to produce LVL and suggested that, if the Respondents were successful in this investigation, Woodgrain would not invest in LVL in the future:

13

**PUBLIC VERSION**

> We have not commercially sold any LVL moulding and millwork products during
> this past year with the things going on with this petition. We have experimented,
> and tested, and we have run successfully some LVL products. But because we've
> seen an uptick in our traditional business due to the results of the preliminary ruling,
> we have not chosen to pursue making any quantity of LVL at this time."

Final Hearing Transcript, PD 203 at 116:22-117:3 (Dec. 23, 2020).

Moreover, *not a single Petitioner testified that they have any notion of the manufacturing costs of LVL*, further indicating that the production processes between LVL and Traditional WMMP are wildly different. Mr. Easton with Woodgrain stated, "I'm not overly familiar with the cost of making LVL as we don't make LVL." Final Hearing Transcript, PD 203 at 117:16-18 (Dec. 23, 2020). Mr. MacDonald with Endura stated that Endura has not received requests for LVL, but that he "believe{d}" it would be a more expensive product to produce (but did not provide any basis for that belief). Final Hearing Transcript, PD 203 at 118:1-2 (Dec. 23, 2020). When members of the Respondents' team at the Final Hearing were unable to provide any information on LVL production costs, Chairman Kearns communicated his confusion on the issue—a confusion shared by Jeld-Wen:

> You're saying well, we would {produce LVL} if the price were right, but you don't
> know if the price to produce L{V}L is any higher than the price of the product you
> make. So, it's not real clear to me why you wouldn't be offering that product,
> especially as you say that from your end of things – the back end of things – it's the
> exact same process.

Final Hearing Transcript, PD 203 at 118:6-11 (Dec. 23, 2020).

The testifying Respondents' difficulty in providing any insight on LVL production costs at the Final Hearing was no surprise. None of the testifying Respondents actually makes LVL because to do so would require entirely substantially different equipment and operations as opposed to Traditional WMMP. Moreover, as the Commission expressly stated in the Final Views,

**PUBLIC VERSION**

"individual domestic producers specialize in the production of either LVL WMMP or other WMMP." Final Views, 15.

### iii. Interchangeability

In its Final Views, the Commission based its like product findings with regard to interchangeability on the performance characteristics of each product. The Commission found that MDF was not sufficiently interchangeable with Traditional WMMP because MDF isn't suitable for use in certain applications. Final Views, 22-23. However, the same is true when comparing Traditional WMMP to LVL—the qualitative superiority of LVL limits its interchangeability with WMMP, particularly in door frame applications, external doors subject to extreme weather, and in applications with high moisture exposure. *Id.* at 14-15. The Commission further noted that, given the superior performance characteristics of LVL, customers prefer LVL in certain applications. *Id.*

The Commission used similar reasoning in finding that MDF and Traditional WMMP were *not* interchangeable. In attempting to establish a lack of interchangeability between MDF and Traditional LVL, the Commission conceded that MDF and WMMP are interchangeable in most decorative interior uses but alleged that the physical limitations of MDF precluded its use in exterior applications and applications subject to moisture. Final Views, 20. However, the Commission had previously noted that *both* MDF and Traditional WMMP may be limited in applications involving high moisture, while LVL is not so restricted. *Id.* at 14, 18. Moreover, when Respondents were asked by Commissioner Kearns at the Final Hearing "approximately what percentage of WMMP sales were for use in external or moist environments," Respondents were unable to provide a substantive answer. Final Hearing Transcript, PD 203 at 113 (Dec. 23, 2020). Instead, Mr. Gartman from Sierra Pacific Industries, merely replied with a vague anecdote about how he had a window in his home which allegedly had MDF trim and moulding, and the window

leaked. *Id.* at 80:2-11. When the same question was asked of the Respondents, Mr. Burke with

Associacao Brasileira da Industria de Madeira Processada Mecanicamente ("AMBCI") indicated

that he believed 75% or greater of what they sold was for interior applications. *Id. at* 229:9-24.

> Further, when asked about the alleged moisture limitations of MDF, Mr. Burke testified:

> "I've been buying and selling MDF millwork for better than 20 years, and I'm not
> sure I could tell you, Commissioner, that I've encountered one or two issues with
> problems with MDF in a bathroom or a kitchen setting because of moisture. Maybe
> if there was a flood, you know, there was an exorbitant amount of water that the
> product was exposed to, but we buy windowsill and baseboard in MDF that's used
> in kitchen and baths. We don't have customers not want that product for that
> application.

Final Hearing Transcript, PD 203 at 230:7-16 (Dec. 23, 2020).  When asked whether there are

humid regions of the U.S. which are not willing to purchase MDF, Mr. Burke responded:

> Generally speaking, I would say it is not. You know, we buy and sell millwork
> throughout the United States. As I mentioned, there's an awful lot of MDF that is
> sold and purchased on the west coast, and I think that's because of the location of
> the mills. But we buy MDF into Texas, into Florida, into Alabama, into Georgia,
> and it's used in all of those environments without issue. It may not be much of a
> market, and I think that's market preference, not necessarily a concern about
> product quality when it comes to moisture resistance.

*Id.* at 230:25-231:10.

> The Commission also noted that Jeld-Wen "increasingly replaced finger-jointed WMMP

with LVL in door frame manufacturing applications" which "suggests a high degree of

interchangeability." Final Views, 14-15. However, this is circular reasoning which should be

disregarded. The fact that JELD-WEN increasingly replaced Traditional WMMP with LVL does

not mean that the products are "interchangeable," but rather that LVL is a superior product. To

find that that the replacement of one product with another is probative as to their

"interchangeability" is a logical fallacy; if the products were interchangeable, the record would

show that Jeld-Wen *shifted back and forth* between using LVL and traditional WMMP, not that it

increasingly replaced Traditional WMMP with a more advanced and qualitatively superior product.

### iv.    Customer Perceptions and Price

The Commission found that customers perceived Traditional WMMP as having superior performance characteristics compared to MDF. Final Views, 18-19. However, the Commission likewise found that customers perceived LVL as having superior performance characteristics compared to Traditional WMMP —i.e. that LVL is a stronger product than Traditional WMMP, particularly for harsh weather outdoor applications. *Id.* at 14-15.

Indeed, as noted by Commissioner Johanson at the Final Hearing, "purchasers cited quality as their most important purchasing factor more often than any other," as shown in Table II-7 of the Staff Report. Final Hearing Transcript, PD 203 at 58:5-9 (Dec. 23, 2020). The Respondents asserted that none of their customers *ever* mentioned quality issues, and instead repeatedly asserted that customers told them that price was their key concern. *Id.* at 58-59. However, this vague anecdotal evidence from the Respondents stands in stark contrast to the actual data collected by the Commission during the investigation. For example, [


]. Prehearing Staff Report, CD 507 at 727467, Table II-7 (Dec. 8, 2020). [


                                                                        ]. *Id.* [




                            ]. *Id.*

Ct. No. 21-00114                                                 **PUBLIC VERSION**

Commissioner Karpel pressed Respondents on this point, asking why, if Respondents contended that they have never lost a sale for non-price reasons, there are not just a few—but "many"—anecdotal statements on the record saying that non-price reasons (i.e. quality) are the reasons why purchasers were buying subject imports. Final Hearing Transcript, PD 203 at 70-1 (Dec. 23, 2020). Just a few examples of these types of statements are provided below:

-    In its questionnaire response  [

                                                                    ].

-    In its questionnaire response, [

      ].

-    In its questionnaire response, [

      ]

Rather than directly answering Commissioner Karpel's question regarding the substantial evidence showing that quality, not price, was the key factor considered by many purchasers, the Respondents instead inexplicably began discussing their issues with short runs as opposed to long runs.

### v.      Channels of Distribution

The Commission noted that similar channels of distribution for LVL and Traditional WMMP was a factor weighing in favor of finding that LVL and Traditional WMMP constitute a single like product. *See* Final Views, 16. However, in its like product analysis of MDF, the Commission also noted that there are similarities between MDF and Traditional WMMP with regard to channels of distribution, yet excluded channels of distribution from those factors which it found weighed in favor of excluding MDF from the Commission's like product determination. *See* Final Views, 22-23. The Commission's determination that the same factor—similar channels of distribution—supported a finding that LVL and Traditional WMMP are a single like product but was not pertinent to its analysis of MDF makes no sense.

### vi.     Conclusion

At the Final Hearing, Commissioner Kearns recognized the inconsistencies in the Respondents' arguments with regard to LVL and MDF, stating:

> If we accept your arguments for similarity of LVL and other in-scope products, wouldn't the same factors largely point to MDF products being part of that like product? You argue that LVL and other in-scope mouldings can be used for many of the same end uses, although LVL products have some different uses. Isn't the same true for MDF products and in-scope products? That is, there are some uses where they are not interchangeable but many where they are.

Final Hearing Transcript, PD 203 at 79:6-15 (Dec. 23, 2020).

Commissioner Kearns' observations neatly sum up the internal illogic of the Commission's like product determinations, concluding that MDF is not a like product while coming to the opposite conclusion as to LVL. The Commission lacked substantial evidence to support such a conclusion.

**B. The Commission's determination that Laminated Veneer Lumber (LVL) and traditional, solid wood mouldings and millwork products ("Traditional WMMP") constitute a single like product, while MDF and Traditional WMMP are not like products, was not in accordance with the law.**

As previously noted, the Commission was required by statute to identify a "domestic like product," which is defined as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle." 19 U.S .C. § 1677(10). In considering the proper interpretation of "domestic like product" under 19 U.S.C. § 1677(10), the court applies the two-step framework of *Chevron*. *NMB Singapore Ltd. v. United States*, 27 C.I.T. 1325, 1331 (2003).

Under step one of *Chevron*, the court considers whether Congressional intent on the issue is clear. *See Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778. Here, the statute does not expressly require or provide for any precise methodology by which the Commission is to identify an appropriate domestic like product, thereby implicating step two of the *Chevron* analysis. *See Chevron,* 468 U.S. at 842-3; 19 U.S.C. §§ 1677(4) & 1677(10). Under *Chevron* step two, the court analyzes whether the agency's construction of the statute was permissible, which is an inquiry into the reasonableness of the Commission's interpretation. *See Chevron,* 468 U.S. at 842-3; *NMB Singapore Ltd.*, 27 C.I.T. at 1331. Under *Chevron* step two, the Commission's interpretation must be set aside if it is arbitrary, capricious, or manifestly contrary to the statute. *Chevron*, 467 U.S. at 844.

**PUBLIC VERSION**

An agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently, which is exactly what happened in this matter. *See, e.g., Dongbu Steel Co. v. United States*, 635 F.3d 1363, 1371 (Fed. Cir. 2011) (citing *Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 260 F.3d 1365, 1379–80 (Fed.Cir.2001) (remanding an agency determination to allow the agency to provide a reasonable explanation for its decision to interpret virtually identical statutory language in related statutes inconsistently)). As discussed at length in Section I(A)-(F), *supra,* the Commission's definition of like product as one which included LVL and Traditional WMMP but excluded MDF was rife with inconsistencies and offered insufficient reasons for treating similar situations differently. It was therefore arbitrary and must be set aside.

## II.     The Commission's determination that there is a single domestic industry, encompassing producers of both LVL and Traditional WMMP, was unsupported by substantial evidence and otherwise not in accordance with the law.

As noted in Section I, *supra*, the Commission is required to determine whether an industry in the United States is materially injured, threatened with material injury, or materially retarded by reason of imports of the subject merchandise. 19 U.S.C. §§ 1671, 1673. Properly identifying the domestic "industry" is therefore critical in determining whether there is any injury thereto. In considering the proper interpretation of "industry" under 19 U.S.C. § 1677(4), the court applies the two-step framework of *Chevron. NMB Singapore Ltd. v. United States*, 27 C.I.T. 1325, 1331 (2003). The term "industry" is defined as "the producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product." 19 U.S.C. § 1677(4)(A). Under *Chevron*, "{i}f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-3. Here, the statute

**PUBLIC VERSION**

clearly states that the industry includes "the producers as a whole *of a domestic like product*," and

the Commission was required to "give effect give effect to the unambiguously expressed intent of

Congress." 19 U.S.C. § 1677(4)(A); *Chevron*, at 842-3.

Here, the Commission defined the domestic "industry" to include producers of both LVL

and Traditional WMMP, which it had determined to be single like product, "WMMP". *See* Final

Views 16, 25. However, as discussed at length in Section I, *supra*, LVL is at most a *separate* like

product with respect to Traditional WMMP. Where there are separate like products, the

Commission is required to identify separate industries for each—i.e. an LVL industry and a

Traditional WMMP industry. *See, e.g., Roquette Freres v. United States* 583 F. Supp. 599, 604

(Ct. Int'l Trade 1984). The Commission's decision to define the domestic "industry" as one which

includes producers of both LVL and Traditional WMMP was therefore directly contrary to the

expressed intent of the statute and must be set aside.

Moreover, in deciding whether a manufacturer is to be included in the Commission's

definition of the domestic "industry", the Commission has stated that its general practice is to

"include in the industry producers of all domestic production of the like product," which requires

a determination of which firms qualify as "domestic producers." Final Views, 24-25. If the two

industries here (LVL and Traditional WMMP) had been separately examined as required by the

statute, the Commission would have found (1) that the sole domestic producer making LVL did

not engage in sufficient production to qualify as a domestic producer (*see Crystalline Silica

Photovoltaic Cells and Modules from China*, Inv. Nos. 701-TA-481 and 731-TA-1190 (Final),

USITC Pub. 4360 at 12-13 (Nov. 2012) (finding that "production-related activity at minimum

levels could be insufficient to constitute domestic production")); and (2) that the domestic LVL

industry was in any event not materially injured by reason of the subject imports because the sole

**PUBLIC VERSION**

domestic producer was incapable of satisfying demand. *See* Prehearing Report, PD 178 at V-31 (Dec. 10, 2020); Final Hearing Transcript, PD 203 at 184:25-185:13 (Dec. 23, 2020). The Commission's determination that there is a single "industry" encompassing producers of both LVL and Traditional WMMP thus had substantial knock-on effects as explained below.

**III.    The Commission's failure to conduct a material retardation analysis as it pertains to LVL, rather than a material injury/threat of injury analysis, was not supported by substantial evidence and was not in accordance with the law.**

The Commission must analyze whether a domestic industry has been harmed by subject imports under either a "material injury/threat of material injury" standard or a "material retardation" standard. *See* 19 U.S.C. §§ 1671b, 1673b; *Laminated Woven Sacks from China*, USITC Inv. No. 701-TA-450 (July 2008) (noting that the Commission has recognized, and the statute indicates, that material injury/threat of material injury and material retardation are mutually exclusive standards). Indeed, the statute clearly contemplates instances where there is no domestic industry of a like product and indicates that, where there is no domestic industry, the Commission *must* decide if "the establishment of an industry in the United States is materially retarded by reason of imports." *See Certain Commuter Airplanes from France & Italy*, 4 ITRD 1366 (1982) (finding that, where the industry defined by the Commission has yet to begin manufacturing the product at issue, material retardation—not material injury or threat of material injury—is the proper issue to be considered). In considering whether the Commission properly interpreted the statute at issue, the court applies the two-step framework of *Chevron*. *NMB Singapore Ltd. v. United States*, 27 C.I.T. 1325, 1331 (2003).

Under step one of *Chevron*, the court considers whether Congressional intent on the issue is clear. *See Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778. Although the statute does not define "material retardation," the Commission has previously indicated that in analyzing the question of

"material retardation" it must first decide whether the U.S. industry is "established." *See Fresh and Chilled Atlantic Salmon from Norway*, Inv. No. 701-TA-302 (Preliminary) and Inv. No. 731-TA-454 (Preliminary), USITC Pub. 2272 (April 1990) at 15-18. Since the statute likewise does not provide any methodology for determining whether an industry has been "established," step two of the *Chevron* analysis is implicated. *See Chevron,* 468 U.S. at 842-3; 19 U.S.C. §§ 1671b, 1673b.

Under *Chevron* step two, the court analyzes whether the agency's construction of the statute was permissible. *See Chevron,* 468 U.S. at 842-3; *NMB Singapore Ltd.*, 27 C.I.T. at 1331. Under *Chevron* step two, the Commission's interpretation must be set aside if it is arbitrary, capricious, or manifestly contrary to the statute. *Chevron*, 467 U.S. at 844.

Historically, the Commission has not limited application of the material retardation statute to instances where there is absolutely zero U.S. production. Instead, if there is only limited domestic production—as is the case here with a single domestic producer of LVL—the Commission conducts a two-step analysis wherein it first determines whether the domestic industry was established. *See, e.g., Laminated Woven Sacks* (Final), USITC Pub. 4025 at 18-19. If the industry was established, then the Commission proceeds to determine whether the domestic injury was materially injured or threatened with material injury by reason of the subject imports. *Id*. If the domestic industry was *not* established, then the Commission proceeds to determine whether the establishment of a domestic industry was materially retarded by reason of the subject imports. *Laminated Woven Sacks* (Final), USITC Pub. 4025 at 19. As already noted, if an industry has not been established, then the Commission *must* proceed under the material retardation standard. *See, e.g., Certain Commuter Airplanes from France & Italy*, 4 ITRD 1366 (1982) (emphasis added).

**PUBLIC VERSION**

To determine whether an industry has been "established", the Commission looks at whether the industry is "stabilized" by examining: (1) the length of domestic production operations; (2) the characteristics of domestic production; (3) the size of domestic operations; (4) whether the proposed domestic industry has reached a reasonable financial "break-even" point; and (5) whether the start-up is more in the nature of the introduction of a new product line by an already established business. *See, e.g., Laminated Woven Sacks* (Final), USITC Pub. 4025 at 19.

In this case, there was only a *single* domestic producer of LVL. *See* Final Hearing Transcript, PD 203 at 263:12-13 (Dec. 23, 2020). The characteristics and size of domestic production by that single domestic producer was such that it was entirely unable to meet the current LVL demand or make LVL in commercial quantities. *See* Prehearing Report, PD 178 at V-31 (Dec. 10, 2020); Final Hearing Transcript, PD 203 at 184:25-185:13 (Dec. 23, 2020). As previously noted, to begin producing LVL in useful commercial quantities, the domestic industry would need to make sizable, upfront investments, which it has declined to do. As discussed at length in Section I(A)(ii), *supra*, the production processes for LVL and Traditional WMMP are significantly different. Indeed, even the Commission noted in its Final Views that "individual domestic producers specialize in the production of *either* LVL WMMP or other WMMP." Final Views, 15 (emphasis added). The production of LVL is therefore not "in the nature of a new product line," but rather constitutes an entirely different product that requires different manufacturing facilities, processes, employees, and equipment. *See* Section I(A)(ii), *supra*.

Accordingly, no domestic LVL industry has been stabilized or established. As a result, the proper framework under which the Commission was required to undertake its injury analysis was the material retardation standard.

**IV.    The Commission's finding that the alleged material injury to the domestic WMMP industry was "by reason of" (caused by) the subject imports was unsupported by substantial evidence.**

Notwithstanding Plaintiff's argument Number III above, and assuming solely for the purpose of this argument that material injury/threat of material injury was the proper legal framework for the Commission's analysis, the Commission's conclusion that any material injury to the domestic industry was "by reason of" the subject imports was nonetheless unsupported by substantial evidence.

In determining whether a domestic industry was "materially injured…by reason of imports," the Commission undergoes a  two-part analysis. *Changzhou Trina Solar Energy Co. v. United States Int'l Trade Comm'n*, 879 F.3d 1377, 1380 (Fed. Cir. 2018).  The Commission must find that there is (1) "present material injury"; and that (2) "the material injury is 'by reason of' the subject imports." *Id.* The "by reason of" language has been interpreted by the courts to mean that "but for" causation is required. *See, e.g., id*.  "It is well-settled that If the ITC is unable to find a causal link between material injury and the imports, then it must deny relief to the domestic industry." *See Comm. of Domestic Steel Wire Rope & Specialty Cable Mfrs. v. United States*, 818 F. Supp. 376, 380 (Ct. Int'l Trade 1993) (citing *Gifford-Hill Cement Co. v. United States*, 615 F. Supp. 577 (Ct. Int'l Trade 1985)).

Although the statute does not define the phrase "by reason of," the Court of Appeals for the Federal Circuit has interpreted this language to require the Commission to consider: (1) the volume of imports of the subject merchandise, (2) the effect of imports of that merchandise on prices in the United States for domestic like products; and, (3) the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States. 19 U.S.C. § 1677(7)(C)(i)–(iv) (directing the

**PUBLIC VERSION**

Commission to consider enumerated topics). The Commission must also examine the impact of factors other than subject imports on the domestic industry to ensure that it is not attributing injury from other factors to the subject imports, thereby inflating an otherwise tangential cause of injury into one that satisfies the statutory material injury threshold. *See, e.g.,* Uruguay Round Agreements Act, Statement of Administrative Action ("SAA") at 851-54 (1994); S. Rep. 96-249 at 75 (1979) (the Commission "will consider information which indicates that harm is caused by factors other than less-than-fair-value imports.").

In this case, any alleged injury to the domestic WMMP industry was not by reason of LVL imports, but rather by reason of other economic factors, including changes in technology, demand and customer tastes, as well as management decisions by domestic producers not to get into LVL production.

LVL is a technologically more advanced, engineered, higher-quality, stronger and more stable product than Traditional WMMP. Final Hearing Transcript, PD 203 at 202:13-21, 203:9-204:6 (Dec. 23, 2020). The LVL production process creates a sturdier product than Traditional WMMP because it breaks the grain structure of ordinary lumber (which causes it to twist and bow), thereby creating a product that is much more stable than Traditional WMMP. *Id.* at 183:18-184:14. Purchasers such as JELD-WEN therefore specifically seek out LVL and Traditional WMMP is not a satisfactory substitute. In fact, at the Final Hearing, Mark Dixon from JELD-WEN testified:

> "{W}e have over the last three to four years made significant conversions…from finger-jointed pine products to LVL products because we see that as a change in technology that allows us to be much more efficient in our manufacturing plants and offer our customers a much more stable product."

*Id.* at 182:21-183:1.

**PUBLIC VERSION**

Given consumer tastes for the higher-quality, engineered LVL product, JELD-WEN is forced to purchase LVL from overseas because domestic production of LVL is incredibly limited. As previously mentioned, Respondent's counsel could only identify a single Petitioner who produces LVL in the U.S. The other Respondents testified at the Final Hearing to having made no effort to invest in domestic LVL production. When Respondents were asked why there is not more domestic production of LVL, counsel for Respondents speculated that "…if the opportunity were there and the price were right, {domestic producers} could run LVL blanks using their equipment." *Id.* at 116:16-17. This type of vague claim that Respondents *might* make LVL "if the price were right" are belied by years of Respondents' ignoring a growing demand for LVL and changing customer tastes for wood alternatives.

With respect to LVL, management decisions by the Respondents are the cause of any alleged material injury suffered by them, not the subject imports. For example, with regard to capacity, Commissioner Johanson noted that "the domestic industry's reported capacity utilization rate was low through the Period of the Investigation, as shown in the C tables. Yet most purchasers reported encountering supply constraints, as shown in…Tables II-9 and II-10 of the staff report." Final Hearing Transcript, PD 203 at 91:6-10 (Dec. 23, 2020). When asked why that is, Mr. Procton from Endura stated that, *inter alia*:

> {W}e look for a commitment, long-term commitment from customers, and so, to make the kind of investment in people or equipment or supervisory, we want to make sure that that's good long-term business, not just something that's going to be a spot buy that's here today, gone tomorrow."

*Id.* at 91:6-25.

Indeed, when asked why the domestic industry isn't producing more gesso coated products such as LVL to meet the demand for those products, Mr. Easton from Woodgrain stated:

**PUBLIC VERSION**

> {I}t's not a technological mystery or something we don't know how to do. We've
> been able to use gesso for a number of years. The primary reason why not all of our
> products are sold with gesso...is because it is not conducive to job shop
> manufacturing, and so much of our orders in the U.S. have been small short runs.
> The gesso process is much more time-consuming to set up and to change over
> between profiled, and when you look at our order patterns in many of our domestic
> facilities, it just is not practical to manufacture with gesso.

*Id. at* 62.

In their Prehearing Brief, Respondents stated that they don't make LVL due to lack of

demand (*See* Pre-Hearing Brief of Petitioners, CD 517 at 728039 (Dec. 15, 2020)), a sentiment

that was reiterated at the Final Hearing by representatives for the Respondents. For example, Gary

Trapp, a representative of Cascade, said that there is no demand for LVL. Final Hearing Transcript,

PD 203 at 47:10-13 (Dec. 23, 2020). Mr. Proctor, a representative for Endura, stated, "I just want

to go on the record saying we've never even received a request for an exterior frame made of LVL

or made with an LVL substitute. Never." *Id.* at 116:9-12. Respondents' own assertions that there

is "no demand" for LVL demonstrates that Respondents can't possibly be suffering from subject

LVL imports. Respondents understandably don't plan to manufacture a product for which they see

no demand among their customers. The Commission's determination that the domestic industry

was injured "by reason" of the subject imports was therefore unsupported by substantial evidence.

## <u>CONCLUSION</u>

For the forgoing reasons, the Court should enter judgment on the agency record in favor of

the Plaintiff on grounds that:

1.   the Commission's determinations were unsupported by substantial evidence; and/or

2.   the Commission's determinations resulted from legal error in the use of an improper

     legal framework;

as further specified in the individual arguments set forth above.

**PUBLIC VERSION**

Respectfully submitted,


James L. Rogers, Jr.
James L. Rogers, Jr.
Nelson Mullins Riley & Scarborough LLP
2 W. Washington Street, Suite 400
Greenville, SC 29601
(864) 373-2300

*Counsel for JELD-WEN, Inc.*

Dated: August 17, 2021

**<u>Certificate of Compliance with Standard Chambers Procedure 2(B)(1)</u>**

The undersigned hereby certifies that the foregoing brief contains 9,157 words, exclusive of the table of contents, table of authorities, and certificate of counsel, and therefore complies with the maximum 14,000-word count limitation set forth in the Standard Chambers Procedures of the United States Court of Trade.

/s/ James L. Rogers        

James L. Rogers

Dated: August 17, 2021

UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| JELD-WEN, INC.,<br><br>               Plaintiff,<br><br>      v.<br><br>UNITED STATES,<br><br>               Defendant,<br><br>      and<br><br>COALITION OF AMERICAN MILLWORK PRODUCERS,<br><br>               Defendant-Intervenor. |

Before: Leo M. Gordon, Judge

Court No. 21-00114

**ORDER**

Pursuant to Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record and supporting brief in the above-captioned matter, it is hereby:

**ORDERED** that Plaintiff's motion is granted; and it is further

**ORDERED** that this case is remanded to the U.S. International Trade Commission, whereby it shall enter a determination that 1) LVL is a separate like product with respect to WMMP; 2) the production of LVL and WMMP constitute two separate domestic industries; 3) a domestic LVL industry has not been established and, accordingly, analyze the claims of Respondents under a material retardation standard rather than a material injury/threat of material injury standard; 4) the domestic WMMP industry was not, in any event, injured or materially retarded "by reason of" the subject imports; and 5) if necessary, open the administrative record and collect additional information from the parties regarding any of the above-referenced matters.

_____

Hon. Leo M. Gordon, Judge

Dated: _____, 2021

      New York, New York