UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE LEO M. GORDON

| | |
|---|---|
| JELD-WEN, INC., <br><br>                 Plaintiff, <br><br>    v. <br><br> UNITED STATES, <br><br>                 Defendant, <br><br>     and <br><br> COALITION OF AMERICAN MILLWORK PRODUCERS, <br><br>              Defendant-Intervenor. | Court No. 21-00114 |

**DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S NONCONFIDENTIAL MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

BRIAN R. SOISET
Attorney-Advisor
U.S. International Trade Commission
500 E Street, SW
Washington, DC  20436
Telephone (202) 205-3399
Fax: (202) 205-3111

DOMINIC L. BIANCHI
General Counsel
Telephone (202) 205-3061


ANDREA C. CASSON
Assistant General Counsel
for Litigation
Telephone (202) 205-3105

**DATED:  NOVEMBER 8, 2021**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... iv

I.      **STATEMENT PURSUANT TO RULE 56.2**.................................................1

      A.    Administrative Determinations Under Review.......................................1

      B.    Issues Presented ...................................................................................1

            1.    Was the Commission's definition of a single domestic
                 like product that was coextensive with the scope of the
                 investigation, and of a single domestic industry
                 producing that product, supported by substantial
                 evidence and in accordance with law? .........................................1

            2.    Was the Commission's analysis of whether injury to the
                 domestic industry was by reason of subject imports
                 supported by substantial evidence and in accordance
                 with law?...................................................................................2

            3.    Was the Commission required to determine whether
                 the establishment of a domestic industry had been
                 materially retarded? ...................................................................3

II.     **ARGUMENT**..................................................................................................4

      A.    The Commission's Findings that There Was a Single Domestic
            Like Product Coextensive with the Scope of the Investigation,
            and a Single Domestic Industry Corresponding to this Definition,
            Were Supported by Substantial Evidence and In Accordance
            with Law ...............................................................................................4

            1.    Legal Principles Governing the Commission's Domestic
                 Like Product Analysis................................................................4

            2.    The Commission's Domestic Like Product Analysis
                 Comparing LVL WMMP with WMMP Made from Other
                 In-Scope Materials was Supported by Substantial Evidence
                 and In Accordance with Law ......................................................6

             3.    Plaintiff's Alternative Comparisons Involving MDF MMP
                 Are Incorrect as a Matter of Law..............................................13

             4.    The Commission's Definition of the Domestic Industry
                 was Supported by Substantial Evidence and In
                 Accordance with Law ...............................................................20

**TABLE OF CONTENTS (cont'd)**

B.   The Commission's Finding that Injury to the Domestic
     Industry Was by Reason of Subject Imports was Supported
     by Substantial Evidence and In Accordance with Law ........................................22

C.   Material Retardation Was Not at Issue in the Underlying
     Investigations ........................................................................................................25

III.   **CONCLUSION** ....................................................................................................**28**

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Asociacion Colombiana de Exportadores de Flores v. United States*,
    12 CIT 634, 693 F. Supp. 1165, (1988) ...........................................................................18, 19

*Autoliv ASP, Inc. v. United States*,
    422 F. Supp. 3d 1295 (Ct. Int'l Trade 2019) ...................................................................14, 28

*Cleo Inc. v. United States*,
    501 F.3d 1291 (Fed. Cir. 2007)...........................................................................................5, 16

*Coal. of Gulf Shrimp Indus. v. United States*,
    71 F. Supp. 3d 1356 (Ct. Int'l Trade 2015) ...........................................................................11

*Hitachi Metals, Ltd. v. United States*,
    350 F. Supp. 3d 1325 (Ct. Int'l Trade 2018),
    *aff'd*, 949 F.3d 710 (Fed. Cir. 2020) ..............................................................................12, 17

*Hitachi Metals, Ltd. v. United States*,
    949 F.3d 710 (Fed. Cir. 2020)......................................................................................12, 16, 17

*JMC Steel Grp. v. United States*,
    70 F. Supp. 3d 1309 (Ct. Int'l Trade 2015) ...........................................................................11

*Me. Potato Council v. United States*,
    9 CIT 293, 613 F. Supp. 1237 (1985) .......................................................................................5

*Mittal Steel Point Lisas Ltd. v. United States*,
    542 F.3d 867 (Fed. Cir. 2008).................................................................................................22

*NEC Corp. v. Dep't of Com.*,
    22 CIT 1108, 36 F. Supp. 2d 380 (1998) .............................................................................5, 19

*Nippon Steel Corp. v. United States*,
    19 CIT 450 (1995) ..................................................................................................................4, 5

*Nippon Steel Corp. v. ITC*,
    345 F.3d 1379 (Fed. Cir. 2003)................................................................................................22

*Sandvik Steel Co. v. United States*,
    164 F.3d 596 (Fed. Cir. 1998)......................................................................................15, 21, 26

*Swiff-Train Co. v. United States*,
    793 F.3d 1355 (Fed. Cir. 2015)................................................................................................22

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**Cases (cont'd)**                                                                                          **Page(s)**

*Timken Co. v. United States*,
    20 CIT 76, 913 F. Supp. 580 (1996) ....................................................................................4

*Torrington Co. v. United States*,
    14 CIT 648, 747 F. Supp. 744 (1990), *aff'd*, 938 F.2d 1278 (Fed. Cir. 1991) ..........4, 5, 18, 19

*Usinor v. United States*,
    28 CIT 1107, 342 F. Supp. 2d 1267 (2004) .......................................................................11

**Statutes**

19 U.S.C. § 1671d(b) ...................................................................................................22

19 U.S.C. § 1673d(b) ...................................................................................................22

19 U.S.C. § 1677(4)(A).............................................................................................4, 20

19 U.S.C. § 1677(10) ................................................................................................4, 16

19 C.F.R. § 207.20(b) ................................................................................................8, 14

**USITC Publications**

*Certain Kitchen Appliance Shelving and Racks*,
    Inv. Nos. 701-TA-458 and 731-TA-1154 (Final), USITC Pub. 4098 (Aug. 2009)................16

*Chassis and Subassemblies from China*,
    Inv. No. 701-TA-657 (Final), USITC Pub. 5187 (May 2021).........................................21, 22

*Cold-Drawn Mechanical Tubing from China and India*,
    Inv. Nos. 701-TA-576-577 (Final), USITC Pub. 4755 (Jan. 2018)........................................27

*Crystalline Silicon Photovoltaic Cells and Modules from China*,
    Inv. Nos. 701-TA-481 and 731-TA-1190 (Final), USITC Pub. 4360 (Nov. 2012)................22

*Large Residential Washers from China*,
    Inv. No. 731-TA-1306 (Preliminary), USITC Pub. 4591 (Feb. 2016) ...................................16

*Professional Electric Cutting and Sanding/Grinding Tools from Japan*,
    Inv. No. 731-TA-571 (Final), USITC Pub. 2658 (July 1993) .................................................27

*Refillable Stainless Steel Kegs from Mexico*,
    Inv. No. 731-TA-1427 (Final), USITC Pub. 4976 (Oct. 2019) ........................................25, 26

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**USITC Publications (cont'd)**                                                                    **Page(s)**

*Tapered Roller Bearings from China,*
    Inv. No. 731-TA-344 (Fourth Review), USITC Pub. 4824 (Sept. 2018) ...............................17

**Other Authorities**

*Wood Mouldings and Millwork Products From the People's Republic of China:*
    *Initiation of Countervailing Duty Investigation,*
    85 Fed. Reg. 6,513 (Dep't of Com. Feb. 5, 2020) ....................................................................6

S. Rep. No. 96-249 (1979) ...............................................................................................................4

Defendant United States International Trade Commission ("Commission") hereby

responds to the brief filed by plaintiff JELD-WEN, Inc. ("Jeld-Wen" or "Plaintiff") (ECF 32).

## I.      STATEMENT PURSUANT TO RULE 56.2

### A.      Administrative Determinations Under Review

Plaintiff seeks review of the Commission's affirmative determinations in the

countervailing and antidumping duty investigations of *Wood Mouldings and Millwork Products*

*from China*, Inv. Nos. 701-TA-636 and 731-TA-1470 (Final), USITC Pub. 5157 (Feb. 2021)

(PR232).[1]  The determinations were published at 86 Fed. Reg. 9,951 (Int'l Trade Comm'n Feb.

17, 2021) (PR236).

### B.      Issues Presented

**1.      Was the Commission's definition of a single domestic like product that was coextensive with the scope of the investigation, and of a single domestic industry producing that product, supported by substantial evidence and in accordance with law?**

Yes.  As statutorily required, the Commission started its domestic like product analysis

with the scope definition made by the U.S. Department of Commerce ("Commerce").  The

Commission first considered whether there were clear dividing lines among the domestically

produced products corresponding to scope products.  In this respect, the Commission examined

whether there were clear dividing lines between wood mouldings and millwork products

("WMMP") that were made from laminated veneer lumber ("LVL") versus WMMP made from

other in-scope materials.  The Commission found that the record supported more similarities than

---

[1] Citations to the public record are indicated by "PR," referring to list number 1 on the index of the administrative record, and citations to the confidential record are indicated by "CR," referring to list number 2 on the index of the administrative record.  Accordingly, citations to the Commission's public "Final Views" are to record document PR232, and citation to the Commission's "Confidential Views" are to record document CR576.

differences between these products and thus did not support a clear dividing line. Accordingly, the Commission included both products within its definition of domestic like product.

Addressing an argument made by respondents, the Commission also considered whether a domestically produced product not corresponding to the scope—medium density fiberboard mouldings and millwork products ("MDF MMP")—should be included in the domestic like product. Because the record indicated there were more differences than similarities between MDF MMP and WMMP corresponding to the scope, the Commission found that there was a clear dividing line between these products. Accordingly, the Commission did not include MDF MMP in its definition of the domestic like product.

In its efforts to urge that LVL WMMP is a separate like product, Plaintiff now argues for a different type of comparison, alleging similarities between LVL WMMP and MDF MMP relative to other in-scope WMMP. Jeld-Wen, however, did not ask for such a comparison during the Commission proceedings and therefore has waived this argument. Moreover, neither the facts nor the legal requirements for the domestic like product analysis support Plaintiff's arguments that this type of comparison should have been employed.

Based on the Commission's reasonable definition of this single domestic like product, the record also supports the Commission's definition of a single domestic industry consisting of all domestic producers of WMMP corresponding to the scope.

> **2.      Was the Commission's analysis of whether injury to the domestic industry was by reason of subject imports supported by substantial evidence and in accordance with law?**

Yes. The Commission found that declines in the domestic industry's market share and performance, during a period when apparent U.S. consumption of WMMP was increasing, resulted from lower-priced subject imports taking sales and market share from the domestic

industry.  Accordingly, the Commission found that the record supported that injury to the domestic industry was by reason of subject imports.

The Commission considered arguments that competition between subject imports and the domestic like product was limited by differences in quality and the availability of LVL WMMP. While acknowledging that some purchasers indicated a preference for subject imports based on these factors, the Commission found that the record as a whole did not support that these factors attenuated competition between subject imports and the domestic like product.  Rather, purchasers generally reported that the domestic like product and subject imports were comparable in terms of quality, and that the quality and the availability of LVL WMMP did not limit substitutability between subject imports and the domestic like product to an appreciable degree.  Moreover, the Commission noted that LVL WMMP accounted for only a small share of overall apparent U.S. consumption.

> **3.  Was the Commission required to determine whether the establishment of a domestic industry had been materially retarded?**

No.  As an initial matter, Jeld-Wen was and is precluded from seeking an analysis of material retardation of a domestic industry, because it failed to make any request that the Commission collect data for such an analysis and failed to argue before the Commission that such an analysis was appropriate.  Regardless, material retardation was not at issue in the underlying investigations because the uncontested record evidence indicated that the domestic industry was established and that it produced WMMP made of LVL and other in-scope materials.  The Commission met its statutory obligation to determine whether the domestic industry defined in its determinations, *e.g.*, domestic producers of WMMP corresponding to the scope, were materially injured by subject imports.

II.     **ARGUMENT**

      A.      **The Commission's Findings that There Was a Single Domestic Like Product Coextensive with the Scope of the Investigation, and a Single Domestic Industry Corresponding to this Definition, Were Supported by Substantial Evidence and In Accordance with Law**

              1.      **Legal Principles Governing the Commission's Domestic Like Product Analysis**

The statute requires the Commission to determine whether the imported articles within the scope of an investigation have injured a domestic industry, which is defined as "the producers as a whole of a domestic like product . . . ." 19 U.S.C. § 1677(4)(A). The statute defines the domestic like product, in turn, as a product "which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation . . ." *Id*. at §1677(10). The definition of the domestic like product(s) therefore defines the parameters of the Commission's assessment of injury.

When analyzing domestic like product issues, the Commission generally considers six factors, no one of which is necessarily dispositive: (1) physical characteristics and uses; (2) interchangeability; (3) channels of distribution; (4) customer and producer perceptions; (5) common manufacturing facilities, production processes, and production employees; and, where appropriate, (6) price. *Nippon Steel Corp. v. United States*, 19 CIT 450, 455 n.4 (1995); *Timken Co. v. United States*, 20 CIT 76, 80, 913 F. Supp. 580, 584 (1996). The Commission does not consider each item of merchandise to be a separate like product that is only "like" its identical counterpart in the scope. Instead, it "disregards minor differences" and looks for "clear dividing lines" among possible like products. *Nippon*, 19 CIT at 455; *Torrington Co. v. United States*, 14 CIT 648, 650-51, 747 F. Supp. 744, 748-49 (1990); *see also* S. Rep. No. 96-249 at 90-91 (1979). In looking for clear dividing lines among possible domestic like products, the Commission does not interpret the domestic like product definition "in such a fashion as to

4

prevent consideration of an industry adversely affected by the imports under investigation."
*Nippon*, 19 CIT at 455; *Torrington*, 14 CIT at 651-52.

As the Commission's reviewing courts have held, the decision regarding what domestic like product is "like" or "most similar in characteristics and uses" to the merchandise within the scope is a factual determination that the Commission makes on a case-by-case basis. *See*, *e.g.*, *Cleo Inc. v. United States*, 501 F.3d 1291, 1299 (Fed. Cir. 2007); *NEC Corp. v. Dep't of Com.*, 22 CIT 1108, 1110, 1036 F. Supp. 2d 380, 383 (1998); *Nippon*, 19 CIT at 455; *Torrington*, 14 CIT at 651-52 & n.3, 747 F. Supp. at 749 n.3 ("{E}very like product determination 'must be made on the particular record at issue' and the 'unique facts of each case.'") (citation omitted). The courts have given substantial deference to the Commission's like product findings because these findings are case-specific and present the Commission with a pure question of fact. *See*, *e.g.*, *Cleo*, 501 F.3d at 1298; *NEC Corp.*, 22 CIT at 1110-11, 36 F. Supp. 2d at 383-84. Indeed, as the CIT has stated, the Commission is vested with "broad discretion in determining whether a particular difference or similarity is minor" when performing its like product analysis and "'{i}t is within the Commission's discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence.'" *Id.* at 1111, 36 F. Supp. 2d at 384 (*quoting Me. Potato Council v. United States,* 9 CIT 293, 300, 613 F. Supp. 1237, 1244 (1985)). Thus, when "reviewing the Commission's like product findings under the substantial evidence test, it is not the province of the courts to change the priority of the relevant like product factors or to reweigh or judge the credibility of conflicting evidence." *Id.*

**2.      The Commission's Domestic Like Product Analysis Comparing LVL WMMP with WMMP Made from Other In-Scope Materials was Supported by Substantial Evidence and In Accordance with Law**

After reviewing the record evidence on the Commission's domestic like product factors comparing WMMP made from LVL and other in-scope materials, the Commission concluded that the record indicated more similarities than differences between the products and, thus, did not support clear dividing lines.  Plaintiff's arguments largely ignore this analysis to focus instead on alleged similarities between LVL WMMP and out-of-scope MDF MMP relative to other WMMP products.  We first discuss below why the Commission's analysis comparing domestically produced in-scope products is supported by substantial evidence and should be sustained by this Court.  We address in the following section why Plaintiff's preferred comparison is misdirected and incorrect as a matter of law.

The Commission began its domestic like product analysis with a consideration of the scope defined by Commerce, and Commerce's scope included WMMP manufactured from materials including finger-jointed softwood or hardwood lumber, LVL, and combinations of wood and composite materials.  *Wood Mouldings and Millwork Products from Brazil and China*, Inv. Nos. 701-TA-636 and 731-TA-1469-1470 (Preliminary), USITC Pub. 5030 at 7 (Mar. 2020) ("Preliminary Views") (PR107); *see also* 85 Fed. Reg. 6,513 (Dep't of Com. Feb. 5, 2020) (PR222) (Commerce's initiation notice describing scope as including WMMP that "are made of wood (regardless of wood species), bamboo, laminated veneer lumber (LVL), or of wood and composite materials…").  MDF MMP was not part of Commerce's scope.

Parties proposed a variety of definitions for the domestic like product before the Commission.  Petitioning domestic firms proposed that the Commission define a single domestic like product of domestically produced articles coextensive with this scope ("in-scope").

6

Confidential Views at 10-11.  Respondent parties proposed three different permutations: (i) separate definitions for in-scope WMMP made from LVL and for other in-scope WMMP (Jeld-Wen's position), (ii) separate definitions for in-scope WMMP made from LVL and another definition combining the other in-scope WMMP with MDF MMP not corresponding to a product within the scope ("out-of-scope"); and (iii) a single expanded definition encompassing all in-scope WMMP as well as out-of-scope MDF MMP.  Confidential Views at 12-13.

In its preliminary determinations, the Commission examined two domestic like product issues: (i) whether there were clear dividing lines between in-scope LVL WMMP and other in-scope WMMP and (ii) whether there were clear dividing lines between in-scope WMMP (inclusive of LVL and other materials) and out-of-scope MDF MMP.  Preliminary Views at 10-17.  Regarding the comparison of in-scope WMMP made from LVL and other materials, the Commission found that the limited record of the preliminary phase supported a "preponderance of similarities" between these products and included them within a single domestic like product.  Preliminary Views at 11-14.  Regarding the comparison of in-scope WMMP and out-of-scope MDF MMP, the Commission found that there were "sufficient differences" between the products to support a clear dividing line, and it did not include MDF MMP within its definition of domestic like product.  Preliminary Views at 14-17.

The Commission also noted in its preliminary determinations that it would "revisit domestic like product issues as appropriate" in the final phase of the investigations and requested that parties seeking a different definition raise such issues in their comments on draft

questionnaires.  Preliminary Views at 10-11 n.51; *see also* 19 C.F.R. § 207.20(b).[2]  The initial

draft questionnaires proposed by the Commission sought additional data regarding WMMP made

from LVL.  Specifically, the draft questionnaires requested that domestic producers, importers,

and purchasers compare in-scope WMMP made from LVL with other in-scope WMMP (*e.g.*,

WMMP made from finger-jointed wood and solid lumber) with respect to each of the

Commission's like product factors.  Draft Questionnaires, U.S. Producer Questionnaire at VI-1,

U.S. Importer Questionnaire at IV-1, and Purchaser Questionnaire at V-1 (Apr. 30, 2020)

(PR120) ("Draft Questionnaires").  Those respondent parties that submitted comments supported

this formulation and did not request that the Commission seek any additional information on

WMMP made from LVL.  *See* Am. Moulding & Millwork All. Comments on Draft

Questionnaires at 1-2 (May 18, 2020) (PR126) (expressing that "we appreciate" proposed

questions on WMMP made from LVL); Composite Tech Int'l, Inc. Comments on Draft

Questionnaires at 2 (May 18, 2020) (PR127) (indicating that it "supports the Commission's draft

questionnaires on LVL").  Notably, Jeld-Wen did not submit comments on draft questionnaires.

The final questionnaires thus adopted this formulation and requested a comparison of in-scope

LVL WMMP and in-scope WMMP made from certain other materials.  *See* Blank

Questionnaires, U.S. Producer Questionnaire at VIII-1, U.S. Importer Questionnaire at IV-1,

Purchaser Questionnaire at V-1 (Sept. 11, 2020) (PR138) ("Blank Questionnaires").

In its Final Views, the Commission examined the full record evidence compiled from

questionnaire responses and party submissions to determine whether there were clear dividing

---

[2] Commission regulations require that in the final phase of investigations, parties requesting the collection of new information, such as a comparison between articles based on the domestic like product factors, must submit requests in comments on the Commission's draft questionnaires. 19 C.F.R. § 207.20(b).

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

lines between WMMP made from LVL versus other in-scope materials.  Confidential Views at

14-22.  The Commission's application of the facts to its domestic like product factors

demonstrates that substantial evidence supports its like product determination.  Regarding

physical characteristics and uses, the Commission noted that WMMP made from all in-scope

materials are molded or carved into the same shapes and dimensions and have the same leading

applications: being used as interior and exterior window and door frames.  Confidential Views at

14.  The Commission also acknowledged differences between these products due to the

"engineered nature" of LVL that can give WMMP made from it greater strength, stability, and

resistance to damage, and that these differences may result in some customers having a

preference for LVL WMMP in certain applications.  Confidential Views at 15-16.  Nonetheless,

the Commission found that such differences were mitigated by domestic producers reporting that

WMMP made from all in-scope materials were fully or mostly comparable with respect to

physical characteristics and uses; even [███████████████████████████

███████████████████████████████████████████████████████

███████████████████].  Confidential Views at 14-15.

Regarding interchangeability, the Commission acknowledged that some customers prefer

LVL WMMP for certain applications, such as external doors subject to high winds or moisture,

but it found that WMMP made from all in-scope materials could be used interchangeably in most

applications.  Confidential Views at 17-18.  For instance, the Commission noted that LVL

WMMP and other in-scope materials shared the same most common applications: external door

frames, door stiles, and quarter rounds, that [████████████████████████

███████████████████████████████████], and also that [█████████

███████████████████████████████████████████████████████

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

█████████████████████████████████████████████ ].

Confidential Views at 17-18.   Indeed, the Commission found that Jeld-Wen had itself during the POI shifted its sourcing of WMMP for its manufacture of door frames from finger-jointed to LVL WMMP products, thereby supporting a finding of interchangeability between these products.  Confidential Views at 17-18.

The Commission found that the record concerning other like product factors indicated a similar mixture of similarities and differences.  It found that the record supported that domestic producers currently use different manufacturing facilities and employees to make LVL WMMP versus other in-scope materials, but that the back-end production processes for making all WMMP, including LVL WMMP and other types, are similar.  Confidential Views at 17.  It found that WMMP made from LVL and other in-scope materials were sold through the same channels of distribution.  Confidential Views at 16-17.  On producer and customer perceptions, the Commission found that customers generally view WMMP made from any in-scope materials to be similar when in the same shapes and applications and that [███████████████████ ██████████████████████ ], reported that both it and its customers perceive the products as "comparable and substitutable."  Confidential Views at 19-20.  The Commission also acknowledged, however, that some customers prefer WMMP made from LVL for certain applications and that domestic producers specialize in one product or the other.  Confidential Views at 19-20.  Finally, the Commission noted that LVL WMMP may command a [██████] price premium over WMMP made from other in-scope materials, but that it can also be lower priced, and that most responding U.S. producers, importers, and purchasers reported that prices for the products were at least somewhat comparable.  Confidential Views at 20.

Considering the record evidence as a whole, the Commission acknowledged that there were both similarities and differences between WMMP made from LVL and other in-scope materials.  Confidential Views at 21-22.  Yet on balance, the Commission concluded that "there are more similarities than differences between LVL WMMP and other in-scope WMMP in terms of the Commission's domestic like product factors" and that as a result there were not clear dividing lines between the products.  Confidential Views at 22.  The Commission found that WMMP made from in-scope materials formed a continuum of products, and it defined a single domestic like product that included WMMP made from LVL and other in-scope materials. Confidential Views at 22.

To the limited degree that Plaintiff even addresses the Commission's analysis comparing WMMP made from LVL and other in-scope materials (as opposed to comparisons concerning out-of-scope MDF MMP addressed below), it merely asks this Court to reweigh evidence considered by the Commission by focusing on evidence that it prefers while ignoring contrary evidence on the Commission's record.  For instance, Plaintiff emphasizes that LVL WMMP may have superior performance to other WMMP and result in some customers preferring LVL for certain applications, but it ignores other record evidence showing that WMMP from LVL and other in-scope materials often have the same uses and may be used interchangeably.  *Compare* Pl.'s Br. at 12, 15 *with* Confidential Views at 14-16, 17-19.  This Court has repeatedly held that it will not "reweigh the evidence or substitute its own judgment for that of the agency."  *E.g.*, *Coal. of Gulf Shrimp Indus. v. United States,* 71 F. Supp. 3d 1356, 1361 (Ct. Int'l Trade 2015); *JMC Steel Grp. v. United States*, 70 F. Supp. 3d 1309, 1315 (Ct. Int'l Trade 2015); *Usinor v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004).  This Court should reject Plaintiff's attempts to reweigh evidence reasonably considered by the Commission.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Plaintiff dismisses as "circular" the Commission's finding that Jeld-Wen replacing finger-jointed WMMP with that made from LVL over the POI supported interchangeability, and it argues that Jeld-Wen replaced these products instead due to the superior performance of LVL. Pl.'s Br. at 16-17.  Whatever Jeld-Wen's reasons for shifting products, it does not alter that the firm used LVL WMMP for the same applications and uses (*e.g.*, in the manufacture of door frames and other products) as finger-jointed WMMP over the POI.  Indeed, [███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████], further demonstrating the interchangeability of these products.  Petitioner's Posthearing Brief at Ex. 2, Att. 1 (CR545).  Jeld-Wen's own shift in the WMMP types used by it in manufacturing door frames and other products during the POI supports a finding of interchangeability between these products.

Finally, Plaintiff argues that domestic producers' lack of investment in making LVL WMMP during the POI, and their lack of knowledge about manufacturing costs for LVL WMMP in general, supported separate domestic like product definitions regarding manufacturing processes and facilities.  Pl.'s Br. at 13-15.  Plaintiff's argument is belied by the record, which shows that at least one domestic producer—Pacific Wood Laminates—*does*, in fact, make LVL WMMP.  Confidential Views at 16.  Moreover, Plaintiff's argument relies on an incorrect premise, that domestic firms must manufacture every product within the definition of domestic like product. To the contrary, as this Court has found, "the lack of domestic production of identical merchandise is not a basis for recognizing a separate domestic like product."  *Hitachi Metals, Ltd. v. United States*, 350 F. Supp. 3d 1325, 1342 (Ct. Int'l Trade 2018), *aff'd*, 949 F.3d 710 (Fed. Cir. 2020).

As demonstrated above, substantial record evidence supports the Commission's findings of more similarities than differences between WMMP made from LVL and other in-scope materials, and that there were not clear dividing lines between the products. Accordingly, this Court should sustain the Commission's definition of a single domestic like product coextensive with Commerce's scope.

### 3. Plaintiff's Alternative Comparisons Involving MDF MMP Are Incorrect as a Matter of Law

In its final determinations, the Commission also examined whether there were clear dividing lines between the continuum of in-scope WMMP articles (inclusive of LVL WMMP), and out-of-scope MDF MMP. Confidential Views at 23-32. The Commission found that record evidence on the domestic like product factors showed both similarities and differences between these products, but that the differences "outweigh{ed}" the similarities and thus supported finding clear dividing lines. Confidential Views at 29-30. As a result, the Commission did not include MDF MMP in its definition of domestic like product.

Plaintiff now relies on the Commission's analysis of the clear dividing line between out-of-scope MDF MMP and in-scope WMMP to argue that the Commission was required to likewise find a clear dividing line between in-scope LVL WMMP and other in-scope WMMP. *See* Pl.'s Br. at 11-20. Rather than recognize that the Commission properly performed two distinct analyses—one comparing LVL WMMP and other types of in-scope WMMP, and the other comparing MDF MMP to in-scope WMMP—Plaintiff engages in an alternative comparison regarding MDF MMP and LVL WMMP, and that both such products are similarly

distinct from a new category of product, "Traditional WMMP."[3]  In Plaintiff's view, the

Commission, having determined not to include MDF MMP in the single domestic like product,

was required to likewise exclude LVL WMMP from the same domestic like product.

Yet Plaintiff's argument for an alternative analysis fails under exhaustion principles.

Neither Plaintiff nor any other party requested that the Commission make alternative

comparisons from those it undertook in the underlying investigations.  Plaintiff therefore has

waived this argument and cannot raise it for the first time on appeal.  As this Court has held,

parties seeking a particular analysis for the Commission's domestic like product are "best

positioned to understand and clarify the parameters of such a request" and should accordingly

provide comments on the Commission's draft questionnaires requesting such information.

*Autoliv ASP, Inc. v. United States*, 422 F. Supp. 3d 1295, 1307-08 (Ct. Int'l Trade 2019); *see*

*also* 19 C.F.R. § 207.20(b).

Plaintiff filed no comments whatsoever on the Commission's draft questionnaires, and no

other party submitting comments requested a comparison of LVL WWMP and MDF MMP, or a

comparison of MDF MMP to a subset of in-scope WMMP products (*e.g.*, Plaintiff's "Traditional

---

[3] The term "Traditional WMMP" was not used in the underlying investigations, and Plaintiff's definition in its brief could be interpreted as referring either to in-scope WMMP other than LVL WMMP, or as referring to all in-scope WMMP products inclusive of LVL WMMP.  Pl.'s Br. at 10.  For instance, Plaintiff characterizes the Commission's underlying domestic like product analysis for both LVL WMMP and MDF MMP as being comparisons with "Traditional WMMP," *see, e.g.*, Pl.'s Br. at 10-11, yet these portions of the Commission's analysis involved comparisons with distinct product groupings, as discussed above.  For purposes of this section, we assume that Plaintiff's "Traditional WMMP" refers to in-scope WMMP exclusive of LVL WMMP, but whatever is intended by the reference, our rebuttal as set out in the text demonstrates the fallacies of Plaintiff's argument.

WMMP").[4]  Indeed, Jeld-Wen took the opposite position before the Commission that it now

takes before this Court.  That is, in its posthearing brief, Jeld-Wen stated that the question of

whether LVL is a separate domestic like product "should not be conflated" with issues around

MDF, and that MDF's exclusion from the scope "does not determine whether LVL is a separate

like product."  Jeld-Wen Posthearing Brief, Doc. at 2 (CR547) ("Jeld-Wen Posthearing Brief").

Because Plaintiff failed to request that the Commission compare these products, and even took

the opposite position before it, Jeld-Wen has waived any challenge concerning MDF MMP on

appeal.  *See, e.g.*, *Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998) (stating

that "'no one is entitled to judicial relief for a supposed or threatened injury until the prescribed

administrative remedy has been exhausted,' … since it is 'a general rule that courts should not

topple over administrative decisions unless the administrative body not only has erred but has

erred against objection made at the time appropriate under its practice'").

---

[4] We also note that in collecting information for a like product analysis of MDF MMP, the draft
questionnaires proposed that parties compare out-of-scope MDF MMP with in-scope WMMP,
which included WMMP made from all in-scope materials such as wood and LVL.  *See* Draft
Questionnaires, U.S. Producer Questionnaire at VII-1, Importer Questionnaire at V-1, Purchaser
Questionnaire at VI-1 (PR120).  As with WMMP LVL, no party requested that the Commission
adopt a different formulation in collecting data on MDF MMP, such as a comparison with
WMMP LVL.  *See, e.g.*, Am. Moulding and Millwork All.'s Comments on Draft Questionnaires
at 2 (May 18, 2020) (PR126); Composite Tech. Int'l Comments on Draft Questionnaires at 2
(May 18, 2020) (PR127); Associacao Brasileira de Industria de Medeira Porcessada
Mecanicamente Comments on Draft Questionnaires at 2 (May 18, 2020) (PR128) (each
indicating that the firm "appreciates" the Commission's questions on MDF MMP).  As a result,
the final questionnaires requested that parties compare out-of-scope MDF MMP with in-scope
WMMP.  *See* Blank Questionnaires, U.S. Producer Questionnaire at VIII-2, Importer
Questionnaire at V-1, Purchaser Questionnaire at VI-1 (PR138).  Another interested party before
the Commission, ABIMCI, argued that it would be "somewhat illogical" for the Commission to
exclude MDF MMP from the domestic like product definition while including LVL WMMP, but
its primary argument was that all in-scope WMMP and MDF MMP were similar and should be
included in a single domestic like product definition, the opposite of Plaintiff's position.  *See,
e.g.*, Hearing Transcript at 144, 143-48 (Dec. 23, 2020) (PR203) ("Hearing Tr.").  Further,
ABIMCI did not limit its analysis to a comparison of MDF MMP and "Traditional WMMP," as
Plaintiff does.  *Id.*

Even were this Court to consider Plaintiff's argument, it is flawed because Plaintiff relies on the wrong comparisons.  Plaintiff's argument and proposed comparisons would short-circuit the essential point that Commerce's scope is the starting point for the Commission's domestic like product analysis, such that the proper analysis is a comparison of (i) LVL WMMP with other in-scope products and (ii) MDF MMP with the continuum of all in-scope articles.  The statute defines "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation." 19 U.S.C. § 1677(10).  The "article subject to an investigation" is a reference to imports defined by Commerce's scope, and the statute thus plainly defines the Commission's domestic like product with reference to Commerce's scope.  Thus, reviewing courts have confirmed that Commerce's scope is "necessarily the starting point of the Commission's like product analysis." *Hitachi Metals*, 949 F.3d at 717 (quoting *Cleo*, 501 F.3d at 1298).  The Commission does have independent authority to define a domestic like product differently from Commerce's scope, but such independence is not unfettered from the scope.  Rather, it permits the Commission to define multiple domestic like products within a single scope defined by Commerce, and/or to define the domestic like product more broadly than Commerce's scope.[5]

Such authority does not extend, however, to cherry-picking certain articles within the scope (*e.g.*, LVL WMMP or "Traditional WMMP") for a comparison with other articles outside the scope (MDF MMP), which is what Plaintiff would prefer.  Indeed, the Federal Circuit has

---

[5] *See, e.g., Certain Kitchen Appliance Shelving and Racks*, Inv. Nos. 701-TA-458 and 731-TA-1154 (Final), USITC Pub. 4098 at 5-7 (Aug. 2009) (defining refrigeration shelving and oven shelving as separate domestic like products when both items corresponded to merchandise described in the scope); *see also Large Residential Washers from China*, Inv. No. 731-TA-1306 (Preliminary), USITC Pub. 4591 at 9-10 (Feb. 2016) (defining domestic like product to include low-tech, front-load washers although such items did not correspond to merchandise described in the scope).

rejected that such an analysis is appropriate. *Hitachi*, 949 F.3d at 717-18.  In *Hitachi*, the underlying investigations involved a scope encompassing a continuum of cut-to-length steel plate products, and respondents argued that the Commission should define a separate domestic like product for one of the products within this continuum, tool steel. *Id*. at 714-16. The plaintiff in *Hitachi* argued that the Commission was required to compare tool steel with products outside of the scope to which it alleged tool steel was most similar, but the Federal Circuit rejected this argument, holding that "{t}he statute does not require such a broad analysis." *Id.* at 717-18. Indeed, it found that unmooring the domestic like product from Commerce's scope in this fashion would "risk{} creating two disconnected agency investigations." *Id*. at 717; *see also Hitachi Metals*, 350 F. Supp. 3d at 1340 (finding that because a comparison of a subset of in-scope products with out-of-scope products is "immaterial" to the domestic like product definition, the Commission was not even required to address the issue in its determinations).

Plaintiff's argument also ignores that the Commission found that WMMP corresponding to Commerce's scope, including that made from LVL, encompassed a "continuum" of product. Confidential Views at 22.  In investigations where domestically manufactured merchandise is made up of a range of products, as in WMMP, the Commission does not consider each iteration of merchandise to be a separate like product that is only "like" its identical imported counterpart in the scope.  Rather, the Commission considers the grouping itself to constitute the domestic like product and disregards minor variations, absent a "clear dividing line" between particular products in the group. *See, e.g.*, *Tapered Roller Bearings from China*, Inv. No. 731-TA-344 (Fourth Review), USITC Pub. 4824 at 5-14 (Sept. 2018) (describing variety of sizes, specifications, and applications for tapered roller bearings but defining a single domestic like product without clear dividing lines between products).  Having found that WMMP products

within the scope were a single continuum, any comparison with MDF MMP would thus appropriately be with all products within this continuum, not the subset of LVL products or "Traditional WMMP" preferred by Plaintiff.

In support of its argument that its alternative analysis would be proper, Plaintiff cites to a hypothetical question from Chair Kearns to domestic producers during the Commission hearing that concerned LVL and MDF products. Pl.'s Br. at 19-20 (citing Hearing Tr. at 79). Commissioner comments during a hearing, however, represent part of the deliberative process in considering party arguments, and they do not constitute either the Commission's or even the individual Commissioner's position. Indeed, Chair Kearns posited the converse of the question to Jeld-Wen representatives, asking them to respond to the hypothetical were the Commission to find that LVL WMMP was *not* a separate domestic like product from other WMMP. Hearing Tr. at 204-07. The analysis, findings, rationale and conclusion of the Commission are encompassed in its final views, which was a unanimous decision that compared LVL WMMP with WMMP made from other in-scope materials. Individual questions from during the Commission's hearing do not detract from these findings.

To the degree that Plaintiff argues that the Commission's respective analyses of LVL WMMP and MDF MMP products exhibited inconsistences that undermine the Commission's definition of domestic like product, this is incorrect as the different determinations reflected the different record evidence for these respective products. As noted above, the Commission's domestic like analysis is a factual determination that is based on the unique facts of each product examined. *E.g.*, *Torrington*, 14 CIT at 652 n.3, 747 F. Supp. at 749 n.3 ("{E}very like product determination 'must be based on the particular record at issue' and the 'unique facts of each case') (quoting *Asociacion Colombiana de Exportadores de Flores v. United States*, 12 CIT 634,

638 & n.5, 693 F. Supp. 1165, 1169 & n.5 (1988)), *aff'd*, 938 F.2d 1278 (Fed. Cir. 1991); *see also NEC Corp.*, 22 CIT at 1111, 36 F. Supp. 2d at 384 ("{E}very like product determination must be based on the particular record at issue and the unique facts of each case."). The respective analyses for LVL WMMP and MDF MMP compared different groupings of products and encompassed different record evidence reflecting these products. *Compare* Final Staff Report at Table I-3 (CR566) ("Confidential Report") (comparing in-scope LVL WMMP with other in-scope WMMP) *with* Confidential Report at Table I-7 (comparing in-scope WMMP with out-of-scope MDF MMP). Examining this record evidence, the Commission explained that there were "more similarities than differences" between LVL WMMP and other in-scope WMMP, Confidential Views at 22, whereas the differences "outweigh{ed}" similarities between MDF MMP and in-scope WMMP. Confidential Views at 29-30. Thus, the Commission explained why it included WMMP made from LVL within the same domestic like product definition as other in-scope WMMP, but it did not include MDF MMP within that definition.

In summary, Plaintiff has waived any argument that the Commission should have made alternative comparisons by failing to exhaust its administrative remedies. However, if the Court considers this argument, Plaintiff's focus on alternative comparisons is incorrect as a matter of law. The statute requires that Commerce's scope act as the starting point for the Commission's domestic like product analysis, which entails a comparison between in-scope WMMP made from LVL and other materials in determining whether there are clear dividing lines between these products. Once the Commission found a continuum of WMMP made from in-scope materials, it properly compared all such in-scope WMMP with MDF MMP and explained that the different record evidence for MDF showed more differences than similarities between these products.

Because the Commission's analysis was supported by substantial evidence and in accordance with law, Plaintiff's arguments should be rejected.

### 4. The Commission's Definition of the Domestic Industry was Supported by Substantial Evidence and In Accordance with Law

The statute defines the domestic industry as "the producers as a whole of a domestic like product . . . ." 19 U.S.C. § 1677(4)(A). Thus, consistent with the Commission's definition of the domestic like product, it defined the domestic industry as the producers of WMMP, coextensive with the scope. Confidential Views at 32-40.[6]

Plaintiff agrees that the Commission must define the domestic industry based on its domestic like product definition. Pl.'s Br. at 21-22. Thus, Plaintiff's sole basis to challenge the Commission's definition of domestic industry is its argument that the Commission should have defined a separate domestic like product for LVL WMMP, and therefore a separate domestic industry for producers of LVL WMMP. As explained above, however, the Commission's definition of a single domestic like product was supported by substantial evidence and in accordance with law, and Plaintiff's arguments fail to establish otherwise. Accordingly, the Commission's definition of a domestic industry encompassing domestic producers of WMMP coextensive with the scope was correct and should be sustained by the Court.

Plaintiff raises another new argument for the first time before this Court: that the sole domestic producer of LVL WMMP does not engage in sufficient production related activities and should not be included within the domestic industry. Pl.'s Br. at 22-23. Plaintiff, however,

---

[6] In defining the domestic industry, the Commission also considered whether domestic producers who purchased blanks and finished them into WMMP engaged in sufficient production related activities, or whether appropriate circumstances existed to exclude domestic producers who were related parties. Confidential Views at 32-40. Plaintiff does not challenge the Commission's findings as related to any of these firms or issues.

made no argument whatsoever concerning the definition of the domestic industry before the

Commission, nor did it or any other party argue that the Commission should examine whether

Pacific Wood Laminate, the domestic producer of LVL WMMP, engaged in sufficient

production related activities.[7]  *See* Jeld-Wen Prehr'g Br. at 1-10 (Dec. 15, 2020) (CR521); Jeld-

Wen Posthr'g Br. at 1-11 (Dec. 31, 2020) (CR547).  Here again, because Plaintiff failed to raise

this issue before the Commission, it has waived any challenge concerning it on appeal.  *Sandvik*

*Steel*, 164 F.3d at 599.

Even were the Court to consider this argument, Plaintiff does not explain on what basis

the Commission should have found that this firm did not engage in sufficient production

activities.  Pl.'s Br. at 22-23.  Given that Plaintiff's arguments emphasize the alleged inability of

domestic producers to make significant quantities of LVL product, *see, e.g.*, Pl.'s Br. at 28-29,

Plaintiff may believe the sole domestic producer's inability to supply all LVL product in the U.S.

market could serve as the basis for its exclusion from the domestic industry, but such an

approach misconstrues the Commission's analysis of sufficient production related activities.

This analysis examines not an individual firm's size relative to other domestic producers or

apparent U.S. consumption, but whether a firm involved in assembly of, finishing, or processing

of, intermediate components engages in sufficient activities to be counted as a producer of the

domestic product.  *See, e.g.*, *Chassis and Subassemblies from China*, Inv. No. 701-TA-657

(Final), USITC Pub. 5187 at 19-25 (May 2021) (examining whether assembly of components

---

[7] We also note that it is not necessary to define a separate domestic industry for the producer of LVL WMMP to consider whether this firm engaged in sufficient production related activities to be included within the definition of domestic industry.  *See, e.g.*, Confidential Views at 32-35 (examining whether firms making WMMP from purchased blanks engaged in sufficient production related activities).  This issue could thus have been raised by Plaintiff before the Commission regardless of the definition of domestic like product and domestic industry.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

into completed chassis units constituted domestic production).  The factors considered by the

Commission for this analysis thus include the technical expertise involved, value added to the

product in the United States, and the quantity and type of parts sourced in the United States.

*Crystalline Silicon Photovoltaic Cells and Modules from China*, Inv. Nos. 701-TA-481 and 731-

TA-1190 (Final), USITC Pub. 4360 at 12-13 (Nov. 2012).  In the underlying investigations, the

Commission considered whether firms that purchased blanks and finished them into WMMP

engaged in sufficient production related activities in the underlying investigations, but this

analysis properly [█████████████████████████████████████████████].

Confidential Report at pg. III-7 & Table III-1.  There is thus no basis to argue that this firm

should be excluded from the domestic industry.

 For the foregoing reasons, the Court should sustain the Commission's definition of the

domestic industry as supported by substantial evidence and in accordance with law.

  **B.**  **The Commission's Finding that Injury to the Domestic Industry Was by Reason of Subject Imports was Supported by Substantial Evidence and In Accordance with Law**

 The statute requires the Commission to determine whether an industry in the United

States is materially injured "by reason of" the imports under investigation.  19 U.S.C.

§§ 1671d(b) & 1673d(b).  This evaluation must ensure that subject imports are more than a

minimal or tangential cause of injury and that there is a sufficient causal, not merely a temporal,

nexus between subject imports and material injury.  *See e.g., Swiff-Train Co. v. United States*,

793 F.3d 1355, 1364 (Fed. Cir. 2015); *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d

867, 873 (Fed. Cir. 2008); *Nippon Steel Corp. v. ITC*, 345 F.3d 1379, 1381 (Fed. Cir. 2003).

 In the underlying investigations, the Commission found that material injury to the

domestic industry included its loss of market share in a growing market and declining

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

performance.  Confidential Views at 61-62.  It further found that such injury was by reason of subject imports; it found a "causal nexus" between these factors and subject imports, including that the increase in subject imports had prevented the domestic industry from capitalizing on the increase in apparent U.S. consumption, and that the domestic industry's financial performance "correlated with trends in subject import market share."  Confidential Views at 61-62.

The Commission also considered whether other factors had an adverse impact on the domestic industry to ensure that it had not misattributed injury from these factors to subject imports.  Confidential Views at 62-69.[8]  Among these factors, the Commission found that the record did not support that differences between subject imports and the domestic like product concerning quality and the availability of LVL WMMP significantly attenuated competition.  Confidential Views at 68.  Notwithstanding that some purchasers reported they preferred subject imports because of these factors, the Commission found that the record indicated that the majority of purchasers reported that domestic WMMP and subject imports were comparable in terms of quality; specifically, the Commission noted that a majority of responding purchasers reported that domestic WMMP was comparable or superior to subject imports in quality meeting/exceeding industry standards, and that domestic WMMP always or usually met minimum quality specifications.  Confidential Views at 69 & n.304.  While only a single domestic firm produced LVL WMMP, the Commission found that this product accounted for less than [███] percent of apparent U.S. consumption over the POI, and that this domestic producer reported [████████████████████████████████████████].

---

[8] Other factors addressed by the Commission, but not challenged by the Plaintiff, include the impact of nonsubject imports, capacity constraints in the domestic industry, the availability of substitute products, and factors regarding specific domestic producers and their effect on the overall domestic industry.  Confidential Views at 62-67.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Confidential Views at 69. Accordingly, the Commission found that these factors did not explain the material injury attributed to subject imports.

Plaintiff largely ignores this analysis to focus instead on its preferred evidence, and it requests that this Court reweigh evidence in its preferred manner. Pl.'s Br. at 27-29. This Court, however, should reject Plaintiff's attempt to reweigh evidence already considered by the Commission. First, Plaintiff focuses on Jeld-Wen's own preference for LVL WMMP and its belief that such products, and therefore subject imports at large, are higher quality than the domestic product. Pl.'s Br. at 27-28. Yet as noted above, Jeld-Wen's preferences did not reflect those of other purchasers, a majority of which reported that domestic WMMP and subject imports were of comparable quality. Confidential Views at 69 n.304 (citing Confidential Report at Table II-10a). Further, Jeld-Wen was not itself so consistent in its preference for LVL WMMP, as indicated [███████████████████████████████████████

███████████████████████████████████████████████████████

████████]. Petitioner's Posthearing Brief at Ex. 2, Att. 1 (Dec. 31, 2020) (CR545).

Second, Plaintiff focuses on there being only a single domestic producer of LVL WMMP to support its argument that purchasers must rely on subject imports for this product (Pl.'s Br. at 28-29), yet this argument again ignores the record evidence that the majority of purchasers considered WMMP made from other in-scope materials (*e.g.*, those offered by other domestic producers) as being suitable for many of the same applications. *See, e.g.*, Confidential Views at 18 ([████████████████████████████████████████████████

████████████]). Even for those applications where customers preferred LVL WMMP, the Commission found that this product accounted for a very limited portion of apparent U.S. consumption (less than [████] percent over the POI) and that the single domestic producer of

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

LVL WMMP had [███████████████████], and thus that such applications did not

substantially attenuate competition between subject imports and the domestic product.

Confidential Views at 68-69.

The Commission's finding that the material injury to the domestic industry was by reason

of subject imports was supported by substantial evidence and in accordance with law.  Plaintiff's

selective arguments to the contrary merely seek to reweigh evidence already considered by the

Commission, and this Court should reject its attempts to do so.

### C.      Material Retardation Was Not at Issue in the Underlying Investigations

As with several other of the arguments Plaintiff makes in this appeal, its efforts to

question the Commission's lack of a material retardation analysis fails for failure to exhaust.

Jeld-Wen neither requested that the Commission collect data for such an analysis nor argued that

such an analysis was appropriate before the Commission.  A Commission analysis of whether a

domestic industry is established, a threshold question for a material retardation analysis, is a

distinct factual inquiry that looks to issues such as the length of domestic operations, whether

domestic operations have reached a "break-even" point, and whether domestic operations are

akin to establishment of a new product line.  *See, e.g., Refillable Stainless Steel Kegs from*

*Mexico*, Inv. No. 731-TA-1427 (Final), USITC Pub. 4976 at 8-19 (Oct. 2019) ("*Kegs Final*")

(discussing history and development of analysis for whether a domestic industry is

"established").  As previously noted, Jeld-Wen submitted no comments on the Commission's

draft questionnaires, nor did any party that did submit such comments request that the

Commission collect data to determine whether a domestic industry was established.  Nor did

Jeld-Wen in its arguments before the Commission argue that (i) the domestic industry producing

LVL WMMP was not established, and if not, (ii) that such industry was not materially retarded

by subject imports.  *See* Jeld-Wen Prehearing Brief 1-10 (CR521); Jeld-Wen Posthearing Brief at 1-11 (CR547).  Plaintiff's failure to raise this issue before the agency results in it waiving any such argument on appeal.  *Sandvik Steel Co.*, 164 F.3d at 599.

Even were this Court to consider the issue, Plaintiff's argument that the Commission should have undertaken a material retardation analysis of the domestic industry producing LVL WMMP is premised on the mistaken assumption that the Commission erred in defining the domestic industry to include domestic producers of all in-scope WMMP.  As discussed above, the Commission's definition of a single domestic like product corresponding to all in-scope WMMP, and thus a single domestic industry, was supported by substantial evidence and in accordance with law, and the Court should thus reject Plaintiff's argument that the Commission was required to consider whether the domestic industry producing LVL WMMP was materially retarded.

Further, Plaintiff's argument (Pl.'s Br. at 23-25) that the Commission should have conducted a material retardation analysis is inconsistent with the facts on the record.  The criteria considered by the Commission in determining whether the domestic industry is established include the length of domestic operations, the nature of domestic production, the size of domestic operations, whether the domestic industry has reached a financial break-even point, and whether production is in the nature of a new product line.  *Kegs Final*, USITC Pub. 4976 at 12.  While the Commission did not collect data specific to these factors and had no need to address this issue, available record evidence pertinent to these factors supports that the domestic industry making WMMP coextensive with the scope (*e.g.*, the domestic industry defined by the Commission) is established.  Various domestic producers have been in operation for decades (*see, e.g.*, Hearing Tr. at 24 (indicating Sierra Pacific Industries has been in operation for 70 years)), domestic

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

production was continuous throughout the POI (Confidential Report at Table III-7), domestic

producers' shipments accounted for between 17.6 and 23.9 percent of apparent U.S. consumption

over the POI, and the domestic industry [███████████████████████████]

(Confidential Report at Table C-1a).  Further, no party alleged before the Commission that

domestic production was akin to a new product line for any producer.  Thus, each factor supports

an established domestic industry, consistent with the Commission's analysis of material injury to

that industry by reason of subject imports.[9]

 Plaintiff's argument that the Commission should have undertaken a material retardation

analysis is thus not based on the record of the underlying investigations, but rather seems

premised on the mistaken assumption that the relative lack of domestic production of LVL

WMMP necessitates such an analysis.  Pl.'s Br. at 24-25.  The Commission has clarified,

however, that the lack of domestic production for an article does not itself necessitate an analysis

of material retardation.  *See, e.g.*, *Cold-Drawn Mechanical Tubing from China and India*, Inv.

Nos. 701-TA-576-577 (Final), USITC Pub. 4755 at 13-15 (Jan. 2018) (finding that material

retardation was not at issue even where domestic producers did not produce the in-scope article

airbag tubing); *see also Professional Electric Cutting and Sanding/Grinding Tools from Japan*,

Inv. No. 731-TA-571 (Final) USITC Pub. 2658 at 17 (July 1993) (finding that material

retardation was not at issue even where domestic producers did not make particular items).  This

---

[9] Also consistent with the Commission's analysis and findings, the record neither supports
Plaintiff's argument for a separate domestic industry for the sole producer of WMMP made from
LVL (as explained *supra*) nor supports the allegation that Pacific Wood Laminates was anything
other than established.  Plaintiff argues that the primary impediment to manufacturing LVL
WMMP is a "sizeable, upfront investment" in the "different equipment and operations"
necessary to make LVL.  Pl.'s Br. at 13-14.  But the record shows that Pacific Wood Laminates'
production capacity [███████████████] over the POI, Confidential Report at Table III-7,
and that [███████████████████████████]. [███████████████████
████████████████████████].

Court has further confirmed that "there is nothing inherent about the absence of domestic production of identical 'like' merchandise that necessitates that the Commission commence a material retardation inquiry." *Autoliv*, 422 F. Supp. 3d at 1306.  Indeed, the *Autoliv* decision is particularly instructive because, as here, plaintiff argued that the Commission should define a separate domestic like product for one item (airbag tubing) within a continuum of product (cold-drawn mechanical tubing), and then conduct a material retardation analysis for this separate domestic like product.  *Id*. at 1300-01.  The Court sustained the Commission's definition of a single domestic like product and rejected that a material retardation analysis was necessary for airbag tubing, even though there was no domestic production of airbag tubing in those investigations.  *Id*. at 1304-06.

Thus, not only has Plaintiff waived its argument that the Commission should have undertaken a material retardation analysis, but neither the record nor the legal standards for such an analysis support its argument.

## III.    CONCLUSION

For the foregoing reasons, this Court should deny Plaintiff's Motion for Summary Judgment and affirm the Commission's determinations in all respects.

Respectfully submitted,


_/s/ Dominic Bianchi_
Dominic L. Bianchi
General Counsel


_/s/ Andrea Casson_
Andrea Casson
Assistant General Counsel for
Litigation


_/s/ Brian R. Soiset_
Brian R. Soiset
Office of General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
(202) 205-3096
_Counsel for Defendant_
_U.S. International Trade Commission_

## CERTIFICATE OF COMPLIANCE

Pursuant to this Court's Scheduling Order 1(f) and Chambers Procedures 2(B)(1) and (2),

I hereby certify that the attached **DEFENDANT UNITED STATES INTERNATIONAL**

**TRADE COMMISSION'S NONCONFIDENTIAL MEMORANDUM IN OPPOSITION**

**TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY**

**RECORD** contains 8,553 words, according to the word-count function of the word processing

system used to prepare this brief (Microsoft Office 365 ProPlus).


Dated: November 8, 2021                     /s/ *Brian R. Soiset*
                                            Brian R. Soiset
                                            Attorney-Advisor
                                            Office of the General Counsel
                                            U.S. International Trade Commission
                                            500 E Street, SW
                                            Washington, DC 20436
                                            Telephone: (202) 205-3399
                                            Facsimile: (202) 205-3111
                                            brian.soiset@usitc.gov