UNITED STATES COURT OF INTERNATIONAL TRADE

---

JELD-WEN, INC.,

               Plaintiff,

    v.

UNITED STATES,

               Defendant,

     and

COALITION OF AMERICAN MILLWORK PRODUCERS,

               Defendant-Intervenor.

Before: Leo M. Gordon, Judge

Court No. 21-00114

---

**OPINION**

[Sustaining the U.S. International Trade Commission's <u>Final Determination</u>.]

Dated: March 28, 2022

    <u>James L. Rogers Jr.</u>, Nelson, Mullins, Riley & Scarborough LLP, of Greenville, S.C., for Plaintiff Jeld-Wen, Inc.

    <u>Brian R. Soiset</u>, Attorney-Advisor, Office of the General Counsel, U.S. International Trade Commission, of Washington, D.C., for Defendant United States. With him on the brief were <u>Dominic L. Bianchi</u>, General Counsel, and <u>Andrea C. Casson</u>, Assistant General Counsel for Litigation.

    <u>Timothy C. Brightbill</u> and <u>Laura El-Sabaawi</u>, Wiley Rein, LLP of Washington, D.C., for Defendant-Intervenor Coalition of American Millwork Producers.

    Gordon, Judge: This action involves the final affirmative material injury determinations by the U.S. International Trade Commission ("ITC" or "Commission") in the countervailing duty and antidumping duty investigations into imported Wood Mouldings and Millwork Products ("WMMP") from China. See <u>Wood Mouldings</u>

and Millwork Products from China, 86 Fed. Reg. 9,951 (Int'l Trade Comm'n Feb. 17, 2021) ("Final Determination"); see also Wood Mouldings and Millwork Products from China, Inv. Nos. 701-TA-636 and 731-TA-1470, USITC Pub. 5157 (Feb. 2021), ECF No. 20-1 ("Views").

Before the court is the USCIT Rule 56.2 motion for judgment on the agency record filed by Plaintiff Jeld-Wen, Inc. ("Jeld-Wen"). See Pl.'s Mot. for J. on the Agency R., ECF No. 32 ("Pl.'s Br."); see also Def.'s Resp. to Pl.'s Mot. for J. on the Agency R., ECF No. 35; Def.-Intervenor Coalition of American Millwork Producers' Resp. to Pl.'s Mot. for J. on the Agency R., ECF No. 37; Pl.'s Reply in Supp. of Mot. for J. on the Agency R., ECF No. 40. The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i),[1] and 28 U.S.C. § 1581(c) (2018). For the reasons set forth below, the ITC's final affirmative injury determinations are sustained.

## I. Background

The statutory framework governing unfair trade investigations requires a determination by the Commission on whether imported articles within the scope of a particular investigation (the "subject merchandise") have injured a domestic industry. See 19 U.S.C. §§ 1671, 1673. Domestic "industry" is defined as "the producers as a whole of the domestic like product...." 19 U.S.C. § 1677(4)(A).

In the underlying investigation, the U.S. Department of Commerce ("Commerce") defined the subject merchandise in relevant part as:

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

> [WMMP] that are made of wood (regardless of wood species), bamboo, laminated veneer lumber (LVL), or of wood and composite materials (where the composite materials make up less than 50 percent of the total merchandise), and which are continuously shaped wood or finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn).

See Views at 6–7. WMMP are "lengths of wood molded into various shapes, or profiles, for use in a wide variety of functional and decorative applications in residential and non-residential construction." Id. at 8. WMMP can be manufactured from "solid or, more commonly, finger-jointed softwood or hardwood lumber; [LVL]; or some combination of wood and composite materials" and are "sold to distributors, construction companies and contractors, lumber wholesalers, and home improvement retailers." Id. at 8–9.

The statute provides for three types of injury to the domestic industry: material injury, threat of material injury, or material retardation of the establishment of an industry. See 19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1). The statute also requires that a causal nexus exist between a type of injury and imports of the subject merchandise, i.e., the injury must be "by reason of" imports of the subject merchandise. Id.

In making its injury determination, the Commission compares subject merchandise to its U.S. domestic counterpart, which by statute must be a product "which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation." 19 U.S.C. § 1677(10). The Commission relies on the scope of the subject merchandise provided by Commerce to serve as the outside parameter for defining the domestic like product. See Views at 5–8; see also NEC Corp. v. Dep't of Commerce, 22 CIT 1108, 1110, 36 F. Supp. 2d 380, 383 (1998) ("[a]lthough the

Commission must accept the determination of Commerce as to the scope of the imported merchandise sold at less than fair value, the Commission determines what domestic product is like the imported articles Commerce has identified").

Where the subject merchandise involves a range of products, as here, the Commission disregards minor variations among them absent a "clear dividing line" between particular products in the range.  See Nippon Steel Corp. v. United States, 19 CIT 450, 455, 1995 WL 170410 (1995) (ITC "disregards minor differences, and looks for clear dividing lines between like products").  The Commission generally considers the following six factors in its like-product analysis: (1) physical characteristics and uses; (2) interchangeability; (3) channels of distribution; (4) customer perceptions; (5) common manufacturing facilities and production employees; and where appropriate, (6) price.  See NEC Corp., 22 CIT at 1110, 36 F. Supp. 2d at 383.[2]

In reaching its Final Determination, the Commission defined "a single domestic like product consisting of all WMMP, coextensive with the scope of the investigations."  Views at 14.  Before the Commission, Jeld-Wen and other respondents objected to the definition of a single domestic like product, arguing that "the Commission should define two domestic like products: (1) LVL WMMP; and (2) all other WMMP described in the scope of the investigations."  Id. at 12.  One of the respondents, other than Jeld-Wen, argued that the proposed second domestic like product, all other WMMP, should also

---

[2] These factors are not exhaustive, as an investigation may give rise to other considerations relevant to the factual determination on the domestic like product, and the Commission's practice in defining domestic like product is on a case-by-case basis with no single factor considered dispositive.  See, e.g., Views at 6.

include medium density fiberboard mouldings and millwork products ("MDF MMP"), even though MDF MMP was not included within Commerce's scope of the investigations.  Id. Another respondent argued in favor of a single domestic like product that included all in scope WMMP and out-of-scope MDF MMP.  Id.  The Commission considered the various arguments, first by comparing LVL WMMP to other in-scope WMMP under the Commission's six-factor domestic like product analysis, and then by comparing MDF MMP to all in-scope WMMP using the same test.  See id. at 14–32.

In analyzing whether to define LVL WMMP and other in-scope WMMP as a single like product, the Commission determined that "[t]here [were] similarities in terms of physical characteristics and uses, interchangeability, channels of distribution, customer and producer perceptions, production processes, and price."  Id. at 21.  Specifically, the Commission found that LVL WMMP and other WMMP are both "made of wood molded into the same shapes for use in many of the same applications, can be used interchangeably in these applications, are sold through similar channels of distribution, are produced using similar back-end equipment and production processes, and are comparable in terms of price."  Id.  The Commission noted that "many customers and producers … perceive LVL WMMP and other WMMP as comparable and suitable for the same end uses."  Id.  While acknowledging that there are some differences between the two types of WMMP—such as the engineered nature of LVL WMMP—the Commission ultimately determined that "on balance, … there are more similarities than differences between LVL WMMP and other in-scope WMMP in terms of the Commission's domestic

like product factors." Id. at 22. The Commission therefore defined a single domestic like product encompassing LVL WMMP and other in-scope WMMP. Id.

Next, the Commission considered whether to include MDF MMP in its like product definition. The Commission acknowledged that both products are "made of or derived from wood that, when molded into the same shapes, may be used interchangeably in decorative interior applications, are sold through similar channels of distribution, … are produced using similar back end processes, with some exceptions," and that "[c]ustomers view the products as interchangeable in many decorative interior applications." Id. at 29. However, the Commission noted that "MDF MMP are made of a different constituent material, medium density fiberboard, that renders MDF MMP more fragile and susceptible to moisture than WMMP." Id. at 30. Consequently, the Commission found that MDF MMP is "unsuitable for exterior applications and applications subjected to high moisture, and generally unsuitable for structural applications and applications requiring small profiles—applications that account for a substantial portion of the WMMP market." Id. at 30. This unsuitability limits the interchangeability of MDF MMP and WMMP largely to "a subset of interior decorative applications." Id. Additionally, the Commission found that "many customers perceive MDF MMP to be an inferior substitute for WMMP in such applications" and "[m]any producers also perceive MDF MMP to be separate and distinct from WMMP." Id. at 27. Finally, the Commission found the prices of MDF MMP to be "significantly lower" than WMMP. Id. at 31. The Commission determined that the record demonstrated "sufficient differences between MDF MMP and WMMP to draw a dividing line at the scope of the investigations, notwithstanding some similarities between

MDF MMP and WMMP." Id. at 32. As a result, the Commission declined to include MDF MMP in the domestic like product. Id.

Consistent with its definition of the single domestic like product, the Commission identified the domestic industry and conducted a material injury analysis. The Commission found that the domestic industry was materially injured through loss of market share in a growing market and declining performance. Id. at 61–62. The Commission further determined that the record demonstrated that there was a "causal nexus" between subject imports and the injury to the domestic industry. Id. Specifically, the Commission found that the increase in subject imports prevented the domestic industry from capitalizing on the increase in U.S. consumption and that "[t]he domestic industry's financial performance correlated with trends in subject import market share." Id. Accordingly, the Commission determined that an industry in the United States was "materially injured by reason of subject imports of WMMP from China that are sold in the United States at [less than fair value] and subsidized by the government of China." Id. at 70. Plaintiff then commenced this action challenging the ITC's Final Determination.

## II. Standard of Review

The court sustains the Commission's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006). Substantial

evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting a reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2022). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2021).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–45 (1984), governs judicial review of the Commission's interpretation of the Tariff Act. See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (An agency's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

### III. Discussion

Jeld-Wen challenges four of the Commission's determinations: (1) that LVL and other in-scope WMMP constitute a single domestic like product, Pl.'s Br. at 5–21; (2) that there is a single domestic industry that encompasses producers of both LVL and other in-scope WMMP, id. at 21–23; (3) that conducting a material injury/threat of material injury analysis of LVL, and not a material retardation analysis of it, was reasonable, see id. at 23-25; and (4) that the alleged material injury to the domestic WMMP industry was "by reason of" the subject imports, id. at 26–29.

### A. Single Domestic Like Product

As explained above, the Commission must identify a "domestic like product" that is defined as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation." 19 U.S.C. § 1677(10). Jeld-Wen maintains that "[i]n considering the proper interpretation of 'domestic like product' under 19 U.S.C. § 1677(10), the court applies the two-step framework of Chevron." Pl.'s Br. at 20. Plaintiff, however, makes no argument challenging the Commission's interpretation of "domestic like product." See id. at 20–21. Rather, Jeld-Wen appears to present arguments challenging the reasonableness of ITC's application of the statutory term "separate like product," a factual issue reviewable under the substantial evidence standard. See id. at 21 (contending that ITC's application of statute in defining domestic like product "as one which included LVL and [other in-scope WMMP] but excluded MDF was rife with inconsistencies and offered insufficient reasons for treating similar situations differently.").

Accordingly, the court will turn to Jeld-Wen's arguments that the Commission's like product determination was unsupported by substantial evidence. See id. at 10–20. Specifically, Jeld-Wen maintains that, in applying the six-factor like product analysis, the Commission unreasonably "found that [MDF MMP] was different from WMMP for many of the same reasons that it chose to ignore or find negligible when comparing LVL to [other in-scope WMMP]." Id. at 10–11.

Regarding the first factor—physical characteristics and uses—Jeld-Wen argues that "[other in-scope WMMP] is typically made from solid or finger-jointed lumber, while LVL and [MDF MMP] are both made from wood derived raw materials that are engineered with glue or resin under heat and pressure to form a finished product." Id. at 11. Jeld-Wen highlights the Commission's findings that LVL WMMP's engineered nature generally gives it an advantage over other in-scope WMMP regarding strength, stability, and resistance to damage. Id. at 12. Jeld-Wen maintains that if "the Commission determined that [MDF MMP] was not included in the Commission's definition of like product despite its general flimsiness (as compared to [other in-scope WMMP]), then it should have found that LVL was a separate like product, given its many enhanced performance characteristics." Id. Jeld-Wen further contends that MDF MMP and other in-scope WMMP have more in common under this factor than LVL WMMP, as "both are weaker than LVL, both have issues being used in areas exposed to high moisture, and both fare poorly in certain structural applications, such as door frames." Id.

Jeld-Wen's arguments above fail to demonstrate that the Commission acted unreasonably in reaching its determination to define the domestic like product as including

LVL with "traditional" WMMP but excluding MDF MMP. The Commission found that LVL, though an engineered product, is "made from thin veneers of wood," while MDF MMP is "made from sawdust and shavings mixed with resin and formed into MDF panels." Views at 15, 23. Furthermore, although LVL WMMP may be preferable in some applications, it is typically used in "structural applications such as interior and exterior window and door frames, which are also leading applications for other WMMP." Id. at 14. MDF MMP, on the other hand, is "unsuitable for external applications and wet environments such as in bathrooms, and generally unsuitable for small profiles and structural applications." Id. at 24. Given these findings, the court concludes that the ITC's analysis of the physical-characteristics-and-uses factor reasonably supports its domestic like product determination.

Turning to the factor of manufacturing facilities, production processes, and production employees, Jeld-Wen underscores the Commission's finding that LVL WMMP and MDF MMP are "made in separate manufacturing facilities using different employees than [other in-scope WMMP]," and that the front-end processes for LVL WMMP and MDF MMP "both differ from [other in-scope WMMP]," while the back-end process for all three are similar. Id. at 13. Jeld-Wen argues that "the Commission attempted to draw a distinction between [MDF MMP] and [other in-scope WMMP] by asserting that [MDF MMP] production requires different, complex, and capital-intensive facilities while ignoring the fact that the same is true as to LVL." Pl.'s Br. at 13. This argument is unpersuasive. While the Commission did find that the back-end production processes are similar for LVL WMMP, other in-scope WMMP, and MDF MMP, it also noted some

exceptions for MDF MMP: "[t]he process of molding MDF into MMP requires carbide blades that yield softer profiles than the steel blades used to mold WMMP, and can also require different molds and tooling than WMMP." Views at 17, 25. Furthermore, Plaintiff's argument that the Commission ignored the differences between LVL and other WMMP production processes is unsupported by the record. The Commission "recognize[d] that there are also some differences between the two LVL WMMP and other WMMP in terms of physical characteristics and uses; manufacturing facilities, processes, and employees; and customer and producer perceptions." Id. at 21–22. Accordingly, this factor likewise reasonably supports the Commission's domestic like product determination.

Regarding interchangeability, the Commission found that "LVL WMMP and other WMMP may be used interchangeably in most applications, although some customers prefer LVL WMMP in certain applications such as fiberglass doors and external doors subject to high winds and moisture." Id. at 17. As to the interchangeability of MDF MMP, the Commission found that "[a]lthough MDF MMP and WMMP are interchangeable in many decorative interior applications, the physical limitations of MDF MMP preclude its substitution for WMMP in exterior applications and applications subject to moisture, and generally in structural applications and applications requiring small profiles." Id. at 26. Jeld-Wen contends that where "[t]he Commission found that MDF was not sufficiently interchangeable with [other WMMP] because MDF isn't suitable for use in certain applications[,] … the same is true when comparing [other WMMP] to LVL—the qualitative superiority of LVL limits its interchangeability with WMMP." Pl.'s Br. at 15. However, the ITC noted that while LVL may be a superior choice in some applications, "[t]he three most

common applications for LVL WMMP, external door frames, door stiles, and quarter rounds, are also served by other WMMP." Views at 18. The ITC thus found that MDF MMP is not nearly as interchangeable with WMMP. See id. at 26. Given this, the Commission's finding that "[t]here are similarities in terms of … interchangeability" between LVL WMMP and other WMMP was reasonable. Id. at 21. Similarly, it was reasonable for the Commission to find that "the differences between WMMP and out-of-scope MDF MMP in terms of … interchangeability … outweigh any similarities. Id. at 29-30.

Regarding the fourth and sixth factors of customer perceptions and price in the like-product analysis, Jeld-Wen argues that the Commission failed to reconcile inconsistent responses of the domestic industry regarding whether price, not quality, was a "key concern" of the industry's customer base. See Pl.'s Br. at 17 ("The Respondents asserted that none of their customers ever mentioned quality issues, and instead repeatedly asserted that customers told them that price was their key concern." (Jeld-Wen's emphasis) (citing Transcript, Commission Hearing (Dec. 23, 2020), PR[3] 203 at 58–59). Jeld-Wen points to anecdotal record evidence relating the importance of quality versus price as a purchasing factor for customers of traditional WMMP and LVL. Id. at 17–19.

---

[3] "PR" refers to a document in the public administrative record, which is found in ECF No. 21, unless otherwise noted. "CR" refers to a document in the confidential administrative record, which is found in ECF No. 20, unless otherwise noted.

For the most part, the Commission simply ignored price as a factor. It found "that customers perceived [WMMP] as having superior performance characteristics compared to MDF" but at the same time found that "customers perceived LVL as having superior performance characteristics compared to [other in-scope WMMP]." See, e.g., Pl.'s Br. at 17 (quoting Views at 18–19, 14–15). Based on the record, with respect to LVL WMMP the Commission found that "domestically produced WMMP is generally comparable to subject imports in terms of quality, and that differences between domestically produced WMMP and subject imports in terms of … the availability of LVL WMMP did not serve to limit their substitutability to an appreciable degree" despite some minor quality differences. See Views at 68–69; see also id. at 69 n.304 ("Most responding purchasers rated domestically produced WMMP as comparable or superior to subject imports with respect to quality meets industry standards (21 of 29) and quality exceeds industry standards (16 of 28). Most responding purchasers, 27 of 40, also reported that domestically produced WMMP always or usually meets minimum quality specifications." (internal citations omitted)).

The Commission also found that "[c]ustomers view LVL WMMP and other WMMP as similar insofar as both come in the same shapes and can be used in many of the same applications, including in door frames." Id. at 19.

With respect to MDF MMP, the Commission noted that "[n]umerous responding producers, importers, and purchasers commented that customers perceive MDF MMP as a less expensive and generally inferior substitute for WMMP in interior applications, and

not as a substitute for WMMP in structural or exterior applications or applications subjected to moisture." Id. at 27.

When it focused on price at all, the Commission found that some LVL WMMP was priced higher, and some was priced lower than other in-scope WMMP. Id. at 20. MDF MMP prices, on the other hand, were "significantly lower than WMMP prices." Id. at28. The Commission's findings regarding the consumer perception and pricing factors for both LVL WMMP and MDF MMP are distinct, and Jeld-Wen's attempt to conflate them here does not persuade the court that the Commission's reasoning is inconsistent or unreasonable.

Finally, Jeld-Wen argues that "[t]he Commission's determination that the same factor—similar channels of distribution—supported a finding that LVL and [other in-scope WMMP] are a single like product but was not pertinent to its analysis of [MDF MMP] makes no sense." Pl.'s Br. at 19. Jeld-Wen's characterization of the ITC's finding on this factor is not supported by the record. The Commission explicitly found that "[m]ost responding domestic producers, importers, and purchasers reported that WMMP is fully or mostly comparable to MDF MMP in terms of channels of distribution," and further acknowledged that "there are some similarities [between MDF MMP and WMMP] in terms of … channels of distribution." Views at 26, 29. Nevertheless, the Commission determined that "the differences between WMMP and out-of-scope MDF MMP in terms of physical characteristics and uses; manufacturing facilities, production processes, and production employees; interchangeability; producer and customer perceptions; and price outweigh any similarities" relative to the factor of channels of distribution. Id. at 29–30.

Despite recognizing the Commission's "broad discretion in determining whether a particular difference or similarity is minor," Jeld-Wen argues that such deference "does not extend to the point where the Commission can permissibly determine that the same difference is minor for one product but major for another." Pl.'s Reply at 4. While the similarities and differences between MDF MMP and WMMP and those between LVL WMMP and other in-scope WMMP might be similar, they are not identical. For example, unlike LVL WMMP, which can be used in "many of the same applications" as other WMMP, MDF MMP is "more fragile and susceptible to moisture than WMMP," making it unsuitable for many of the applications of WMMP. Views at 21, 30. Furthermore, while many customers perceive LVL WMMP and other WMMP as "comparable and suitable" for the same end uses, many customers perceive MDF MMP to be an "inferior substitute" to WMMP in interior decorative applications. Id. Therefore, given the totality of the record, the court cannot agree with Plaintiff that "the reasons that the Commission relied upon to determine that MDF was not included within the Commission's definition of the domestic like product were equally applicable to LVL." See Pl.'s Br. at 10.

Overall, the Commission explained that the demonstrated similarities outweighed the differences between LVL WMMP and other in-scope WMMP, and that the demonstrated differences outweighed the similarities between MDF MMP and WMMP. See Views at 22, 32. Accordingly, the Commission's determination that LVL WMMP and other in-scope WMMP constitute a single domestic like product, while MDF MMP is excluded, is sustained as reasonable.

## B. Single Domestic Industry

Jeld-Wen next argues that "[t]he Commission's decision to define the domestic 'industry' as one which includes producers of both LVL and [other in-scope WMMP]" was unreasonable. Pl.'s Br. at 22. As discussed above, in order to determine whether an industry is materially injured, threatened with material injury, or materially retarded by reason of imports of the subject merchandise, the Commission must identify the relevant domestic "industry." 19 U.S.C. §§ 1671, 1673. As Jeld-Wen points out, the statute defines "industry" in relevant part as "the producers as a whole of a domestic like product…." see Pl.'s Br. at 22 (quoting 19 U.S.C. § 1677(4)(A)). Jeld-Wen maintains that, because "LVL is at most a separate like product with respect to [other in-scope WMMP]," the Commission was required to identify an LVL industry separate from an industry encompassing other in-scope WMMP. Pl.'s Br. at 22.

Ultimately, to prevail on this argument, Plaintiff must demonstrate that it was unreasonable for the ITC to include LVL in the domestic like product. Because the court sustains the Commission's determination that LVL WMMP and other in-scope WMMP constitute a single domestic like product, it will likewise sustain the Commission's determination that there is a single domestic industry that includes producers of all in-scope WMMP.

## C. Material Retardation

Plaintiff argues that "the Commission's failure to conduct a material retardation analysis as it pertains to LVL, rather than a material injury/threat of injury analysis, was not supported by substantial evidence and was not in accordance with the law." Pl.'s Br.

at 23. Plaintiff maintains that "[i]n considering whether the Commission properly interpreted the statute at issue, the court applies the two-step framework of Chevron." Id. (citing NMB Singapore Ltd. v. United States, 27 CIT 1325, 1331, 288 F. Supp. 2d 1306, 1312 (2003)). Although Plaintiff accurately explains the two-step framework of Chevron, nowhere in its litigation brief does Plaintiff challenge the ITC's interpretation of any statutory provision. Pl.'s Br. at 23–25. Instead, the crux of Plaintiff's challenge appears to be focused on whether the ITC reasonably applied the statutory provisions at issue. See id. at 25. Plaintiff maintains that in circumstances where there is only limited domestic production of merchandise identical or similar to certain subject imports, the Commission conducts a two-step analysis to determine whether subject imports were materially retarding the establishment of a domestic industry. See id. at 24–25. Plaintiff further contends that in determining whether an industry has been established, the ITC examines: "(1) the length of domestic production; (2) the characteristics of domestic production; (3) the size of domestic operations; (4) whether the proposed domestic industry has reached a reasonable financial "break-even" point; and (5) whether the start-up is more in the nature of the introduction of a new product line by an already established business." See id. at 25. Plaintiff also maintains that the characteristics and size of domestic production were unable to meet the current LVL demand and LVL is not in the nature of a new product line. Id. These arguments require the court to consider factual information on the record and evaluate the agency's decision against the substantial evidence standard (reasonableness review). However, Jeld-Wen made no argument whatsoever regarding material retardation before the Commission, nor did Jeld-Wen even

mention the term "material retardation" in its administrative case briefs before the ITC. See Prehearing Brief of Jeld-Wen, Inc. (Dec. 15, 2020), CR 521; Posthearing Brief of Jeld-Wen, Inc. (Dec. 31, 2020), CR 547.

In challenging final agency action, such as the underlying material injury determination by the ITC at issue here, litigants must generally exhaust administrative remedies. See 28 U.S.C. § 2637(d). Having failed to raise this argument before the Commission, Plaintiff may not raise it now. See Carpenter Tech. Corp. v. United States, 30 CIT 1373, 1374–75, 452 F. Supp. 2d 1344, 1346 (2006) (citing Woodford v. Ngo, 548 U.S. 81, 89 (2006)). This is precisely the sort of argument for which exhaustion of administrative remedies is appropriate. Had Jeld-Wen presented the material retardation argument directly to the Commission at the agency level, the twin purposes of the doctrine of exhaustion of administrative remedies—protecting administrative agency authority and promoting judicial efficiency—would have been served. Id. By failing to raise its argument about the material retardation at the administrative level, Jeld-Wen deprived the ITC of the opportunity to address that issue and "apply its expertise," potentially "rectify administrative mistakes," or "compile a record adequate for judicial review." Id. Therefore, the court deems Plaintiff's material retardation argument waived, and will sustain the ITC's determination as to this issue.

## D. Causation

The Commission will make an affirmative material injury determination when it finds (1) material injury that is (2) by reason of the subject imports. See Swiff-Train Co.

v. United States, 793 F.3d 1355, 1359 (Fed. Cir. 2015).  To determine whether a domestic

industry is materially injured, the ITC considers:

> (I) the volume of imports of the subject merchandise,
> (II) the effect of imports of that merchandise on prices in the
> United States for domestic like products, and
> (III) the impact of imports of such merchandise on domestic
> producers of domestic like products, but only in the context of
> production operations within the United States.

19 U.S.C. § 1677(7)(B)(i).  The ITC may also "consider such other economic factors as

are relevant to the determination regarding whether there is material injury by reason of

imports."  See id. § 1677(7)(B)(ii).  No single factor is dispositive, and the ITC evaluates

"all relevant economic factors … within the context of the business cycle and conditions

of competition that are distinctive to the affected industry."  19 U.S.C. § 1677(7)(C)(iii).

Here, the ITC's material injury analysis resulted in affirmative findings as to the volume,

pricing, and impact factors.  19 U.S.C. § 1677(7)(B)(i)(I)–(III).

Plaintiff maintains that any material injury to the domestic industry was by reason

of "other economic factors," but does not challenge the reasonableness of the ITC's

determinations regarding volume and pricing of subject imports.  See Pl.'s Br. at 26–29

(contending that any alleged injury resulted not from LVL imports but from "changes in

technology, demand and customer tastes, as well as management decisions by domestic

producers not to get into LVL production").

In evaluating the impact of subject imports on the domestic industry, the ITC

evaluates "all relevant economic factors which have a bearing on the state of the industry,"

including, but not limited to:

(I) actual and potential decline in output, sales, market share, gross profits, operating profits, net profits, ability to service debt, productivity, return on investments, return on assets, and utilization of capacity,
(II) factors affecting domestic prices,
(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,
(IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and
(V) in a proceeding under part II of this subtitle, the magnitude of the margin of dumping.

19 U.S.C. § 1677(7)(C)(iii). The statute further provides that ITC "shall evaluate all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry." Id.

The Commission observed an increase in apparent U.S. consumption between 2017 and 2019, while "the domestic industry's operating and financial performance declined by nearly all measures." Views at 56. Specifically, the Commission also perceived that (1) "[t]he domestic industry's capacity, production, and rate of capacity utilization declined between 2017 and 2019;" (2) "the industry's employment indicators declined between 2017 and 2019;" (3) "the domestic industry also experienced a decline in its U.S. shipments and market share;" (4) "the domestic industry's end-of-period inventories increased irregularly between 2017 and 2019;" (5) "[t]he domestic industry's net sales revenues declined each year and its profitability declined between 2017 and 2018 before improving in 2019 to a level below that in 2017;" and (6) "[t]he domestic industry's declining performance resulted in plant closures, production curtailments, and

layoffs." <u>Views</u> at 57–61.  The Commission found "a causal nexus between subject imports and the domestic industry's declining performance between 2017 and 2019, noting that [s]ubject import volume and market share increased significantly between 2017 and 2018 and remained elevated in 2019 at the direct expense of the domestic industry." <u>See id.</u> at 61.  The ITC also found that "[d]ue to subject imports, the domestic industry was unable to capitalize on the 4.0 percent increase in apparent U.S. consumption between 2017 and 2019, and instead suffered declining performance according to most measures during the period." <u>See id.</u> at 61–62.

Jeld-Wen argues that "any alleged injury to the domestic WMMP industry was not by reason of LVL imports, but rather by reason of other economic factors, including changes in technology, demand and customer tastes, as well as management decisions by domestic producers not to get into LVL production." Pl.'s Br. at 27.  However, the Commission considered whether such other factors had an adverse impact on the domestic industry to ensure that "it had not misattributed injury from these factors to subject imports." <u>Views</u> at 62–69.  The ITC found that "differences between subject imports and the domestic like product in terms of quality, gesso coatings, and the availability of LVL WMMP did not significantly attenuate subject import competition," because "domestically produced WMMP is generally comparable to subject imports in terms of quality, and that differences between domestically produced WMMP and subject imports in terms of gesso coatings and the availability of LVL WMMP did not serve to limit their substitutability to an appreciable degree." <u>Views</u> at 68–69 (citing Table II-10a, II-12). Specifically, the Commission noted that:

> Most responding purchasers rated domestically produced WMMP as comparable or superior to subject imports with respect to quality meets industry standards (21 of 29) and quality exceeds industry standards (16 of 28). Most responding purchasers, 27 of 40, also reported that domestically produced WMMP always or usually meets minimum quality specifications.

See Views at 69 n.304 (internal citations omitted).

The Commission also observed that "LVL WMMP accounted for a small share of apparent U.S. consumption of WMMP during the 2017–19 period" and "[t]he domestic industry also produced substantial volumes of WMMP with an extruded gesso coating … and most responding purchasers reported that such coatings were only somewhat or not important to their purchasing decisions." See id. at 69. Plaintiff's conclusory contention that any injury resulted from "changes in technology, demand and customer tastes, as well as management decisions by domestic producers not to get into LVL production," fails to address the ITC's findings in support of its determination. See Pl.'s Br. at 27–29. For the court to remand and direct the ITC to reach Plaintiff's preferred conclusion that any injury was not due to subject imports, Plaintiff needed to establish that its preferred conclusion is the one and only determination on this administrative record, not simply that its preferred outcome may have constituted another possible reasonable choice. See Tianjin Wanhua Co. v. United States, 40 CIT ___, ___, 179 F. Supp. 3d 1062, 1071 (2016) (citing Globe Metallurgical Inc. v. United States, 36 CIT 1222, 1230, 865 F. Supp. 2d 1269, 1276 (2012)). Plaintiff has failed to make such a showing, and accordingly, the court concludes that the ITC reasonably found that the volume, price effect, and impact

of subject imports on the domestic producers of domestic like products were significant.

Accordingly, the court will sustain the <u>Final Determination</u>.

## IV. Conclusion

For the foregoing reasons, the court denies Jeld-Wen's motion for judgment on the agency record and sustains the Commission's <u>Final Determination</u>.  Judgment will enter accordingly.

_____/s/ Leo M. Gordon_____
Judge Leo M. Gordon

Dated: March 28, 2022
      New York, New York